587 A.2d 511

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Morton J. OWRUTSKY.

Misc. (Subtitle BV) No. 25, Sept. Term, 1988.

Court of Appeals of Maryland.

March 27, 1991.

**336**

Kendall R. Calhoun, Asst. Bar Counsel, for the Attorney Grievance Com'n of Maryland.

Barry Helfand, Rockville, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE,* RODOWSKY, McAULIFFE, ADKINS ** and CHARLES E. ORTH, JR. (Retired, Specially Assigned), JJ.

McAULIFFE, Judge.

The Attorney Grievance Commission seeks disciplinary action against Morton J. Owrutsky, alleging misconduct in the handling of a client's funds as attorney in fact, and misconduct during his service as personal representative and trustee in closely related estates. Bar Counsel recommends disbarment. Respondent denies any wrongdoing, and alternatively suggests that if the record demonstrates any misconduct it is of a character warranting no more than a reprimand.

## I.

Respondent has been a member of the Maryland Bar for nearly 30 years, and maintains an office for the practice of law in Salisbury, Maryland. He met Joseph Peigert in 1964, and thereafter represented Mr. Peigert and his wife in various business and personal matters. Mr. Peigert and respondent appear to have been close personal friends. In August, 1975, respondent prepared a will for Mr. Peigert, in which respondent and Doris McMahon, Mr. Peigert's daughter, were named as co-personal representatives. The will,

---

\* Cole, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

\*\* Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

after providing for a number of specific bequests totaling $33,000, established a marital and a nonmarital or "second" trust. Upon the death of Mrs. Peigert, the remainder of the marital trust was to become a part of the second trust,[1] and the second trust was to be divided into three shares for the benefit of Mr. Peigert's daughter, his son, and a class consisting of his then living grandchildren.

In October, 1975, respondent, at the request of Mr. Peigert, opened a bank account at Second National Building and Loan, Inc. (Second National) in the name of "Morton J. Owrutsky, Attorney for Joseph Peigert," and deposited more than $78,000 received from the proceeds of sale of some of Mr. Peigert's property.

Mr. Peigert died on 2 February 1976, leaving an estate of about $778,000, consisting of $611,000 in cash, certificates of deposit, and bank accounts; $10,000 in stocks; $2,000 in tangible personal property; and $155,000 in real estate. Respondent immediately began to collect the liquid assets of the estate, and deposited them in the Second National account. At the same time, respondent opened a bank account at Truckers & Savings Bank, in the name of the estate. Through 1 February 1980, however, funds belonging to the estate and to the trusts created by Mr. Peigert's will were also maintained in and disbursed from the clients' fund account of respondent's law firm.

Meanwhile, on 5 March 1976, respondent supervised the execution by Mrs. Peigert of a codicil to her 1968 will, and a broad power of attorney in favor of respondent, both of which had been prepared by respondent. On 20 March 1976, respondent opened another account at Second National, entitled "Morton J. Owrutsky, Attorney for Ella Peigert."

On 17 June 1977, Mrs. Peigert died. Respondent, the surviving personal representative under her will, did not

---

1. This pour-over provision was subject to the exercise of a testamentary power of appointment by Mrs. Peigert, which she did not exercise.

open her estate until 16 October 1978. The value of this estate was approximately $134,000, consisting of $51,000 in jewelry, $35,000 in real property, $46,000 in cash and receivables, and $2,000 in tangible personal property. Under the terms of Mrs. Peigert's will, all of her estate went into the second trust established by the will of her late husband. This estate was not closed until February, 1984. In May, 1978, respondent opened three accounts in Truckers & Savings Bank, one for each of the beneficiaries, or class of beneficiaries, of the second trust.

On 28 April 1984, Mrs. McMahon filed a complaint with the Attorney Grievance Commission, alleging multiple violations of the Code of Professional Responsibility [2] by respondent. Upon receipt of the complaint, the Office of Bar Counsel conducted an investigation and on 21 October 1985 referred the matter to an Inquiry Panel pursuant to Maryland Rule BV6. Hearings were held in December, 1985, and the report of the Inquiry Panel was forwarded to the Review Board in May, 1986. The Review Board remanded the case to the Inquiry Panel for further information concerning 12 specified subjects. After some delay, additional hearings were held in March, 1987, after which the record was held open until July to permit the parties to file memoranda in support of their respective positions. The Inquiry Panel forwarded its supplemental report to the Review Board in July, 1988. The Review Board directed Bar Counsel to file a complaint for disciplinary action with this Court, and that complaint was filed on 16 December 1988.

This Court referred the matter to Judge Arthur M. Ahalt for further proceedings, pursuant to Md. Rule BV9. On 3 February 1989, respondent filed a motion to dismiss the complaint, contending he had been prejudiced by what he considered to be an inordinate delay in the filing of charges

---

**2.** The Code of Professional Responsibility governed the conduct of attorneys until 1 January 1987, when it was replaced by the Maryland Rules of Professional Conduct. *See* Maryland Rule 1230.

against him. Judge Ahalt heard arguments and received memoranda of the parties with respect to the motion to dismiss, and that motion is now before us for decision. Judge Ahalt also conducted a hearing on the underlying charges, and filed findings of fact and conclusions of law, determining that respondent is guilty of multiple violations of the Code of Professional Responsibility.

Respondent filed exceptions, contending the evidence is insufficient to prove any violation. Petitioner filed exceptions to two findings of fact made by Judge Ahalt, and recommends disbarment as the appropriate sanction for the violations found. We first consider respondent's motion to dismiss.

## II.

■ Respondent concedes that disciplinary proceedings are not barred by a general statute of limitations. *Anne Arundel Co. Bar Ass'n v. Collins*, 272 Md. 578, 582, 325 A.2d 724 (1974). He argues, however, that this action is barred by laches. In rejecting a similar contention in *Collins*, we quoted with approval the following statement of the Supreme Court of Oregon in *In re Weinstein*, 254 Or. 392, 459 P.2d 548, 549 (1969), *cert. denied*, 398 U.S. 903, 90 S.Ct. 1689, 26 L.Ed.2d 61 (1970):

> It is unnecessary to define in this case the proper remedy for vexatious and unreasonable delay on the part of the Bar. None has been shown in this case. It ought to be made clear, however, that *the primary purpose of professional disciplinary proceedings is to protect the public*. The punishment of an offending member of the profession is indeed a serious matter, but it is incidental to the protection of the public. If the conduct of a member of the Bar disqualifies him from the practice of law, *it would not be in the public interest to dismiss the disciplinary proceedings for no reason other than the Bar's failure to prosecute them with the proper dispatch*. 459 P.2d at 549 (emphasis added).

Similarly, in *Attorney Griev. Comm'n v. Kahn*, 290 Md. 654, 684, 431 A.2d 1336 (1981), this Court said that "[b]ecause the purpose of disciplinary action against an attorney is to protect the public, dismissal of the disciplinary petition for the sole reason that the Attorney Grievance Commission failed to proceed with the proper dispatch is manifestly unwarranted."

Respondent argues that in both *Kahn* and *Collins* we relied upon the absence of prejudice in finding the defense of laches inapplicable. He suggests that he has been prejudiced because his bookkeeper, Bette Jane Patt, who handled much of the accounting and transfers of funds in connection with the estates and the trust, died in 1988. Bar Counsel responds by pointing out that the bookkeeper testified before the Inquiry Panel on two separate occasions, while under oath and subject to cross-examination, and that her testimony was recorded on both occasions. Thus, Bar Counsel suggests, her testimony was admissible as a "prior testimony" exception to the hearsay rule. *See* 6 L. McLain, *Maryland Evidence* § 804.1 (1987). Respondent did not seek to introduce any of the bookkeeper's testimony in the hearing before Judge Ahalt. Judge Ahalt found that respondent had not been prejudiced by the delay in filing charges. We agree, and we deny the motion to dismiss. Turning to the substantive issues, we consider the violations found by Judge Ahalt, and respondent's exceptions to those findings.

### III.

 Judge Ahalt found that respondent violated Disciplinary Rule (DR) 9–102(A) and Art. 10, § 44, Maryland Code (1957, 1981 Repl.Vol.) [3] by keeping estate funds in his firm's escrow account from 1976 until 1980. Respondent argues that neither the disciplinary rule nor the statute prohibited

---

**3.** Article 10, § 44 was repealed by ch. 3, § 3, Acts of 1989. Currently, see §§ 10–301 through 10–306, Business Occupations and Professions Article, Md.Code (1989).

the deposit of the funds of several clients in a common escrow account, and that he did not understand that the funds of a decedent's estate must be maintained in a separate account until this Court said so in *Attorney Griev. Comm'n v. Boehm,* 293 Md. 476, 479 n. 2, 446 A.2d 52 (1982).[4]

Respondent is correct in his assertion that DR 9–102(A) and Art. 10, § 44 focused on the prohibition against commingling of personal or business funds with funds belonging to others. Although what we said in *Boehm* continues to be the law of this State,[5] we recognize that respondent did not maintain estate funds in his clients' fund account after *Boehm* was decided, and we do not believe that a violation of DR 9–102(A) or Art. 10, § 44 has been shown in this instance. Accordingly, respondent's exception is sustained as to this finding.

## IV.

Judge Ahalt found that respondent violated Disciplinary Rules 1–102(A)(4), (5), and (6) by taking fees from both estates before they were earned and before approval of the Orphans' Court had been sought or obtained, and in taking fees from both decedent's estates without any approval of the Orphans' Court. He found that:

> On December 1, 1976, the respondent disbursed to his law firm fees totalling $30,000 from the funds of the estate of Joseph Peigert being maintained in the law

---

4. We said in *Boehm:* "It is the obligation of an attorney upon receiving funds representing the assets of an estate to deposit those funds in a separate estate account clearly identifiable by the name of the decedent. Such funds should not be commingled in an escrow account, general or otherwise."

5. Maryland Rule BU7 b 3, which permits commingling of the funds of several clients in a single attorney trust account, does not apply to "a fiduciary account maintained by an attorney as personal representative, trustee, guardian, custodian, receiver, or committee, or as a fiduciary under a written instrument or order of court." Md. Rule BU1.

firm's escrow account. This was done prior to perform-ance of any substantial services to the estate and without the approval of the Orphans' Court.

On October 10, 1978, the respondent filed a Petition for Personal Representative's Commission in the amount of $24,997.74 which was approved. No fee petition was ever filed in that estate either for the $30,000 fee or for the difference between that amount and the amount approved as commission. The respondent never filed a petition for additional fees nor were they accounted for in any of the estate accountings.

* * * * * *

On November 30, 1978, the respondent took a $5,000 fee from the estate of Ella Peigert without the approval of the Orphans' Court for Worcester County. On Octo-ber 24, 1980, the respondent took an additional $4,500 fee from Mrs. Peigert's estate without the approval of the Orphans' Court. The respondent filed a petition for attor-ney's fee in the amount $5,000 on January 20, 1981. That fee was approved on January 27, 1981. The respondent never filed a petition for additional fees taken nor were they accounted for in any of the estate accountings.

Judge Ahalt's findings are supported by the evidence.

Additionally, the mechanics of the taking of the original "fee" of $30,000 from the estate of Joseph Peigert gener-ates a concern about respondent's original intent. When the $30,000 was paid to respondent's firm, the funds of the estate were being held in the firm's clients' fund account. A ledger sheet kept for that account shows that on 1 December 1976 three checks were drawn totaling $30,000, in the amounts of $8,346.92, $12,500.00, and $9,153.08. No matching vouchers were produced, and the ledger entry simply shows "POW PA Fee." The reference to "POW PA" is to the firm of Purdue, Owrutsky & Whitehead, P.A. The estate of Joseph Peigert was not opened until 8 Septem-ber 1976, and it was a relatively uncomplicated estate, consisting mainly of liquid assets easily assembled. As Judge Ahalt found, respondent had not then rendered any

substantial service to the estate. In short, there was no justification for the fee, and no explanation for the breakdown of $30,000 into three checks with precise amounts. The lingering concern is whether this method of payment represented an attempt to partially conceal a large fee, or perhaps was so structured that it might later be accounted for as a payment by the estate of fees earned by the respondent for work done for the decedent prior to his death. The hearing judge made no finding concerning the reason for the structuring of the payment, and the record provides no satisfactory explanation.

Respondent subsequently secured the approval of the Orphans' Court for a payment of a net personal representative's commission of $24,997.74 and accounted for that payment. In neither account filed in the estate, however, does the respondent account for the additional $5,002.26 taken by him from Joseph Peigert's estate. In his exceptions, respondent offers this explanation:

> The difference was paid on behalf of the trusts. There were no other estate commissions or fees. Fees were taken in connection with the trusts.

This bald assertion is wholly unsupported by the record. When the $30,000 "fee" was paid to the firm, the trusts had not been funded. The record is devoid of any evidence of the computation of or billing for a trustee's commission or attorney's fee for services rendered to the trusts in this amount. There were statements rendered for attorney's fees for services rendered to the trusts, but these are all accounted for.

The accounting practices employed in the handling of the estates and trusts were, at best, woefully deficient. Estate funds were kept in the firm's escrow account for a long period of time. Expenditures later claimed as proper payments by the trusts were made directly from estate funds, rather than by the orderly funding of the trusts from estate assets and the separate expenditure of trust monies by the trustees. Moreover, there were transfers of funds between estate, law firm, and trust accounts, which may be charac-

terized generally as internal loans made to meet cash demands.

As a result, it has been difficult for Bar Counsel, the Inquiry Panel, the Review Board, and this Court to determine exactly what was being done with the substantial amounts of money involved. Respondent now wishes to turn that self-generated confusion to his advantage, suggesting that somewhere, somehow, he must have been entitled to trustee's commissions, and that this accounts for the $5,002.26 otherwise unaccounted for in the estate. The hearing judge did not accept this argument, and neither do we.

Respondent's explanation of the fees taken in the estate of Ella Peigert is no better. He justifies the first $5,000 fee because a fee in that amount was later approved by the Orphans' Court. He claims the second fee of $4,500 "represented payment for services in connection with the trust." Again, there is no support for this contention in the record. Every bill produced by the respondent for attorney's fees for services rendered to the trust is shown to have been paid from other sources. We accept Judge Ahalt's findings concerning the fees taken in each estate.

█ There are two serious violations here. Respondent took fees of $5,002.26 from the estate of Joseph Peigert, and $4,500 from the estate of Ella Peigert, without the approval of the Orphans' Court, and without accounting for those funds. Moreover, he took additional fees from each estate which, although later approved, had not been approved by the Orphans' Court at the time they were taken. Respondent treats this second violation as a rather minor matter. It is not. The funds held are those of the estate, and not those of the attorney. The attorney has no right to those funds, either as a commission or as an attorney's fee, unless and until an approval pursuant to § 7–601 or § 7–602 of the Estates and Trusts Article, Maryland Code (1974, 1990 Cum.Supp.) has been obtained from the Orphans' Court.

Fiduciaries in general, and attorneys in particular, must remember that the entrustment to them of the money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds. Appropriating any part of those funds to their own use and benefit without clear authority to do so cannot be tolerated.

Arguing that an unauthorized "advance" was later approved as a fee is little better than arguing that a fiduciary may dip into the client's funds for a "loan" as long as the money is later repaid. *See Attorney Griev. Comm'n v. Pattison*, 292 Md. 599, 606, 441 A.2d 328 (1982) ("loan" taken by attorney from estate funds, although later repaid with interest, constituted "an inexcusable and unjustified breach of his fiduciary obligations to the estate and a serious invasion of the integrity of the assets of the estate"). Respondent's exceptions to Judge Ahalt's findings concerning fees taken from the estates are overruled.

## V.

The hearing judge also concluded that respondent violated the disciplinary rules "in that his handling of the estate and trust funds was not prudent, the appropriate accounts were not maintained, and prudent accounting practices were not followed which cost the estates unnecessary bank charges." He found that respondent had deposited more than $4,440 of funds of Joseph Peigert's estate in the Second National bank account entitled "Morton J. Owrutsky, Attorney for Joseph Peigert," and that checks were written on trust accounts established for the individual beneficiaries when there were insufficient funds to cover them, resulting in presentment fees totaling $936 being charged against the accounts. As we have previously noted, the record also demonstrates that the accounting procedures employed by respondent were deficient in a number of respects, and the transfer of and accounting for funds between trust, estate, escrow, and other accounts was not sufficiently precise to comply with the standards of a fiduci-

ary or the care required of attorneys by DR 9–102(B). Respondent's exceptions to these findings are overruled.

## VI.

Judge Ahalt found that respondent was guilty of neglect "in that the estate of Ella Peigert was not opened for more than a year after her death, accountings were not timely filed and the estate was not concluded for more than seven (7) years." Concerning the late opening of the estate, respondent replied that "there is no time requirement for opening estates." With respect to the failure to conclude the estate within a reasonable period of time, respondent says, in very general terms, that there are often tax considerations that justify keeping an estate open for a period of years. He offers no evidence that those tax considerations were present in this case. He also points out that there was "interplay of funds between the estate and various trusts." He does not explain why that was necessary in this case, or why that fact contributed to delay.

The estate of Ella Peigert was an uncomplicated matter. Respondent was the sole personal representative. He knew the decedent's affairs—indeed he held $46,380 of her funds under a general power of attorney which expired upon her death. The balance of her estate subject to probate in this State consisted of a home and furnishings in Pocomoke City, Maryland, jewelry, an automobile, and modest proceeds from a life insurance policy. By the terms of her will, her entire estate went into the second trust established by her late husband. There were a modest number of bills to be paid, and estate tax liability arising from the marital trust created in her favor by her late husband. We accept the findings of the hearing judge that the respondent was guilty of neglect in failing to promptly open the estate, as well as in his handling of the estate.

## VII.

Finally, Judge Ahalt found that respondent was guilty of misconduct because he made a loan to himself from the

assets of one of the trusts he administered. Judge Ahalt found the following facts:

On August 17, 1981, the respondent withdrew $48,-370.82 from a passbook account at Second National entitled "Owrutsky and Drake, attorneys for Robert Peigert Trust" and deposited those funds into his escrow account. On August 18, 1981, a $40,000 check was drawn on those trust funds in the respondent's escrow account to the order of Gerald and Bette Patt. The $40,000 escrow check was redeposited the same day to the respondent's escrow account as funds of Gerald and Bette Patt. The same day two $20,000 checks were then drawn on those funds in the escrow account, one to the order of Bette Patt and one to the order of Owrutsky and Drake, P.A., the respondent's law firm. The $20,000 escrow check to Owrutsky and Drake, P.A. was deposited into the law firm's general account and on that same day, August 18, 1981, respondent drew a $20,000 check to himself from the firm's general account. The balance in the respondent's firm's general account at the time of the $20,000 deposit was $5,034.14. The respondent signed all of the checks in this transaction, and was fully aware that he was obtaining $20,000 from the trust funds. A demand note to the Robert Peigert trust for $40,000 was signed by Bette and Gerald Patt. Bette Patt was the respondent's employee since 1969 and a close friend. The loan to Gerald and Bette Patt was made without the knowledge or consent of Doris McMahon, co-trustee, and was unsecured.

\* \* \* \* \* \*

The court concludes that part of the loan to Bette Patt was, in fact, a loan to the respondent from trust funds, which was improper and violated the [disciplinary rules].

Respondent has vacillated in his response to this allegation of wrongdoing. In response to that portion of petitioner's complaint detailing this loan, respondent originally said:

Respondent admits the allegations of Paragraphs 40, 41, 42, 43, 44, 45 and 46. In further answer thereto the

Respondent states he deeply regrets the loans having been made to him in the fashion described hereinabove. While all of the monies have been repaid, with interest, the Respondent recognizes that mere payment is not a sufficient response to this Petition or this Honorable Court. The Respondent believes that he was under a severe disability at the time this transaction took place, because of the untimely death of the Respondent's dear and beloved brother, Norman. Respondent acknowledges that what took place was a terrible error in judgment and the Respondent submits that this was behavior that was an aberration to his normal and prior conduct and his subsequent conduct.

He now says, in response to Judge Ahalt's findings, that *assuming* any loan was made to him, it was not improper. He states:

Even if one assumes *arguendo* that the $40,000 loan to the Patts, and their subsequent $20,000 payment to Owrutsky and Drake, P.A. and ultimately to Owrutsky was intended to benefit Owrutsky personally, as long as the estate was repaid the loan with interest, it was permitted under the will.

The provision of the will, upon which respondent relies to excuse himself from the ordinary prohibition against self-dealing, is one of several grants of powers to the personal representatives and trustees named in the will. It provides:

I hereby expressly authorize and empower my Personal Representatives and my Trustees, each respectively, in their sole and absolute discretion:

\* \* \* \* \* \*

To invest, reinvest and change the investment of any property it holds in a fiduciary capacity hereunder and to keep the same invested in such stocks, common or preferred, bonds, mortgages, ground rents or other property, real or personal, as it may consider advisable or proper, without being restricted by any statute or rules of law or Court governing the investment of fiduciary (estate or trust) funds; notwithstanding that at any time, or from

time to time, the proportion of such property so held hereunder invested in common stocks would be substantially larger than would be considered prudent in many situations by a fiduciary which would normally, in the absence of special requests to the contrary as herein set forth, feel it proper to reduce over a period of time the proportion of such investments held.

The effect to be given a provision of this kind depends upon several factors, most notable of which are the intent of the person creating the fiduciary relationship, and the status of the law governing fiduciary investments in the jurisdiction involved. With respect to the effect of such provisions in trust instruments, Professor Scott makes these observations:

It is in each case a question of interpretation whether or not the terms of the trust enlarge the scope of permissible investments and if so to what extent. This depends upon how broad the scope of proper trust investments is in the particular state in the absence of a provision in the trust instrument and upon the breadth of the language used in the instrument. Where by statute or by judicial decision the scope of trust investments is narrow, an authorization to the trustee to make investments "in his discretion" is ordinarily interpreted to enlarge his powers so that he can properly make such investments as a prudent man would make. In states in which in the absence of a provision of the trust instrument the trustee can properly make such investments as a prudent man would make, a provision authorizing him to make investments "in his discretion" ordinarily does not extend his powers. A provision in the terms of the trust authorizing the trustee to exercise his discretion in making investments is not interpreted as permitting him to make investments which a prudent man would not make.

3 A. Scott, *The Law of Trusts* § 227.14, 1848–52 (3d ed. 1967). *See also* G. Bogert, *The Law of Trusts and Trustees* §§ 542, 680–83 (rev. 2d ed. 1978).

This Court has held that exculpatory clauses are valid, and will be enforced according to their tenor, with certain limitations. In *Sullivan v. Mosner*, 266 Md. 479, 494–96, 295 A.2d 482 (1972), we cited with general approval § 222 of *Restatement (Second) Trusts* (1959), and held that in the absence of any evidence to show that the exculpatory clause was inserted in the trust instrument as the result of an abuse by the trustee of a fiduciary or confidential relationship to the settlor, a clause purporting to release the trustees from any "personal responsibility" was effective to protect the trustees from liability except for acts committed in bad faith, or intentionally, or with reckless indifference to the interests of the beneficiary, or for any profit which the trustees derived from a breach of the trust.[6]

■ Concerning the exculpatory clause in the case before us, we believe a strong argument may be made that the testator intended only to grant very general authority with respect to the nature of permissible investments, and to grant relief from the strictures of any "legal list"[7] which might exist, without relieving the fiduciaries of the responsibility to invest as a prudent person would. We need not resolve that question, however, because we are not here concerned with a loss due to an imprudent investment.

---

6. The testator in the case before us adopted a similar standard in partially relieving his fiduciaries from responsibilities from losses that might result from holding property that a prudent person would have sold. He provided: "Any fiduciary acting hereunder, while acting in good faith, shall not be liable or held responsible for any loss or depreciation in the value of property held in fiduciary capacity hereunder, but shall be liable for only loss resulting from its own willful default or gross negligence."

7. Maryland follows a "prudent person" standard for investment by fiduciaries. *Board of Trustees v. City of Baltimore*, 317 Md. 72, 102–03, 562 A.2d 720 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990); *Shipley v. Crouse,* 279 Md. 613, 621–22, 370 A.2d 97 (1977); *McCoy v. Horwitz,* 62 Md. 183 (1884). Section 15–106 of the Estates and Trusts Article, Md.Code (1974, 1990 Cum.Supp.) establishes a non-mandatory list of investments that "shall be lawful for any person." *See generally* Tralins, *Contemporary Fiduciary Investments: Why Maryland Needs The Prudent Man Rule,* 12 U.Balt.L. Rev. 207 (1983).

Rather, we address the propriety of a loan made by a trustee to himself from trust funds. We hold that the loan was unauthorized and improper.

The making of this loan involves a violation of the duty of loyalty owed by a fiduciary. We said in *Gianakos, Ex'r v. Magiros,* 238 Md. 178, 185–86, 208 A.2d 718 (1965), that:

> There is no equitable principle more firmly established in our jurisprudence than that a fiduciary is under a duty of loyalty to his beneficiaries and cannot use the property of a beneficiary for his own purposes.

It is a breach of trust for a trustee to lend trust funds to himself. *Attorney Griev. Comm'n v. Pattison,* 292 Md. at 608, 441 A.2d 328; *Veterans' Administration v. Hudson,* 169 Md. 141, 146–47, 179 A. 836 (1935); 2 A. Scott, *The Law of Trusts, supra,* § 170.17, 1352. And, "[t]his is true even though by the terms of the trust [the trustee] is given the widest powers of investment." 2 A. Scott, *supra,* § 170.17, 1352–53.

> Even where the trustee is authorized to make such investments as in his absolute and uncontrolled discretion he may see fit, however, it has been held that he cannot properly lend trust funds to himself personally.

3 A. Scott, *supra,* § 227.14, 1852. *See also Carrier v. Carrier,* 226 N.Y. 114, 123 N.E. 135, 138 (1919) (clause granting "absolute and uncontrolled" discretion in making investments did not relieve trustee "from obedience to the great principles of equity which are the life of every trust," and which prohibit the trustee from making a loan to himself); G. Bogert, *The Law of Trusts and Trustees, supra,* § 543(J).

■ Respondent's subtle suggestion that the transaction in question may not have been a loan to himself is without merit. "In deciding whether a given transaction is tainted with disloyalty the court will look through all subterfuges and indirections. It will consider the substance and not merely the form." G. Bogert, *supra,* § 543(T), 359. The hearing judge found by clear and convincing evidence that

this transaction represented a loan of $20,000 to the respondent, and that finding is amply supported by the record.

Not only does the convoluted structure of this loan transaction prove unavailing as a defense, it is damning in its implication of a deliberate, willful breach of fiduciary duty. Had the respondent honestly believed, no matter how naively, that the trust instrument permitted him to make a loan to himself, there would have been no need to attempt to conceal the true nature of the transaction by utilizing the bookkeeper and her husband as straw parties. Respondent's exceptions to the hearing judge's findings concerning this loan are overruled.

## VIII.

The loan that respondent made to himself was not the only loan that Bar Counsel alleged was improper. On 7 July 1976, respondent made an unsecured personal loan of $25,000 to Elwood French, his friend and business associate,[8] from the funds of Ella Peigert which respondent then held in his capacity as her attorney in fact. Although a demand note was taken, no payments were made for three years. The power of attorney, drawn by respondent, authorized him to invest Mrs. Peigert's funds "in any stocks, bonds, shares, notes, mortgages, or other securities as to him shall seem fit and proper." The loan was repaid, with interest, in October, 1979.

On 19 July 1977, respondent made an additional loan to French. This loan, from the funds of the estate of Joseph Peigert, was in the amount of $100,000, and was unsecured. French signed a 45–day note, which was subsequently rewritten on several occasions. French repaid $60,000 within

---

8. French testified that he had known respondent since 1969, when they bought an apartment house together. He said that from 1975 until 1984 or 1985, they built several buildings together, and jointly operated a motel. He estimated that he and respondent had been involved in six or eight business enterprises together during that period of time.

90 days, but made no further payments until 1982. The loan was ultimately repaid in full, with interest.

Finally, as a part of the same transaction that involved the loan respondent made to himself, respondent made an unsecured loan of $20,000 from trust funds to his bookkeeper and her husband. This loan was also ultimately repaid, with interest. The loans made with estate and trust funds were made without the knowledge or consent of the co-fiduciary.

The hearing judge did not find that these additional loans constituted direct or indirect self-dealing. He made a general finding that respondent's "handling of the estate and trust funds was not prudent," but that finding appears to be related to respondent's failure to maintain appropriate accounts and to follow prudent accounting practices, and not to imprudent investments. Respondent produced evidence that French had assets of approximately two million dollars at the time the loans were made; that at the time the loans were made, local banks were willing to loan French substantial sums of money without security; that respondent was familiar with French's financial condition; and, that the interest rates paid on the loans were at or above market rates. Bar Counsel offered no evidence to the contrary. With respect to the loan to respondent's bookkeeper and her husband, respondent testified he had known the borrowers for more than 20 years; that he knew them to be honorable "business people" who had experience in investments, and who had substantial assets; and, that the loan was repaid with 20 percent interest.

As earlier indicated, we need not determine whether these loans were within the power granted to respondent by the exculpatory clauses of the power of attorney or of the will. The hearing judge did not find a specific violation based upon these loans, and Bar Counsel took no exception to the absence of such a finding. We do not wish to be understood, however, as directly or tacitly approving the conduct of the respondent in making these loans. The loans were made without the knowledge or consent of the co-fiduciary,

which was clearly wrong. The loans were made to close friends, one of whom was then a business associate, thus raising the specter of indirect disloyalty. *See* G. Bogert, *The Law of Trusts and Trustees, supra,* § 543(T). The loans were unsecured, and apparently issued without any financial statement having been obtained from the borrowers. Notwithstanding our obvious concern about these loans, we will not, under the circumstances of this case, consider the making of them to have been in violation of the Code of Professional Responsibility.

## IX.

Petitioner filed two exceptions to the findings and conclusions of the hearing judge. One exception involves an apparent confusion concerning the dates and amounts of repayments of certain loans. The exception correctly points out the mistake, and we have considered it in this opinion. The second exception is more substantive. Petitioner excepts to Judge Ahalt's finding that "all the monies that were received in all of the Peigert matters were completely and totally accounted for and no party suffered a loss." Bar Counsel points out that the fees taken without court approval represent expenditures for which no proper accounting has been made, and a loss to the estates. Moreover, the finding made by Judge Ahalt that the trust suffered an unnecessary expense of more than $900 in presentment fees is inconsistent with the finding that "no party suffered a loss." Petitioner's exceptions are sustained.[9]

## X.

### *Sanction*

We reach the more difficult aspect of this case—the appropriate sanction to be applied for the respondent's

---

9. Any claims the beneficiaries may have had against respondent for financial losses were released by the execution of a settlement agreement by the parties on 31 January 1984, after the beneficiaries had obtained the advice of private counsel and an accountant.

misconduct. Respondent's carelessness and neglect in the handling of these estates and trusts cannot be overlooked. Even more serious is his conduct in taking fees from the estates before, and in some cases without, approval of the Orphans' Court, and in making a loan to himself from trust funds. The latter transgressions come perilously close to misappropriation of funds for which, in the absence of extenuating circumstances, disbarment is ordinarily the appropriate sanction. *Attorney Griev. Comm'n v. Boehm,* 293 Md. at 481, 446 A.2d 52; *Attorney Griev. Comm'n v. Pattison,* 292 Md. at 609, 441 A.2d 328; *Attorney Griev. Comm'n v. Burka,* 292 Md. 221, 225, 438 A.2d 514 (1981). Indeed, Bar Counsel argues that on the authority of *Attorney Griev. Comm'n v. Mason,* 295 Md. 49, 453 A.2d 143 (1982), and *Pattison,* disbarment is the appropriate sanction in this case.

We do not find *Mason* and *Pattison* sufficiently analogous to justify imposition of the sanction of disbarment solely upon their precedent. In *Mason,* the attorney was guilty of misconduct beyond that which we have found here, including willful failure to file income tax returns and willful failure to remit State income tax withheld from employees. In *Pattison,* the attorney took sums of money from the estate account for his own use on 30 occasions over a period of two and one-half years. When confronted, the attorney said he had taken the money as "loans," although there was apparently no documentation to support even that contention. Describing these actions as "peculations," this Court concluded that "in our view the taking of money over the period of time involved amounted to a misappropriation warranting disbarment." 292 Md. at 609–10.

The purpose of disciplinary proceedings is to protect the public rather than to punish the erring attorney, although concepts of general and specific deterrence are consistent with that primary goal. *Attorney Griev. Comm'n v. Alison,* 317 Md. 523, 540–41, 565 A.2d 660 (1989). Respondent has been a practicing member of the Maryland Bar for

nearly 30 years, and he has no record of previous miscon-
duct. Under the totality of the circumstances, we conclude
that the appropriate sanction is a substantial suspension
from the practice of law. Morton J. Owrutsky shall stand
suspended from the practice of law for a period of three
years, and thereafter until all costs are paid. This sanction
shall take effect 30 days from the date this opinion is filed.

IT IS SO ORDERED. RESPONDENT SHALL PAY
ALL COSTS AS TAXED BY THE CLERK OF THIS
COURT, INCLUDING THE COSTS OF TRANSCRIPTS
PURSUANT TO MARYLAND RULE BV15 c FOR WHICH
SUM JUDGMENT IS ENTERED IN FAVOR OF THE
ATTORNEY GRIEVANCE COMMISSION AGAINST
MORTON J. OWRUTSKY.

ORTH, J., would have disbarred respondent.