669 A.2d 1344

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

**v.**

**Alan C. DREW.**

**Misc. Docket (Subtitle BV) No. 40, Sept. Term, 1994.**

Court of Appeals of Maryland.

Jan. 16, 1996.

Melvin Hirshman, Bar Counsel, and Kendall R. Calhoun, Assistant Bar Counsel, for the Attorney Grievance Commission of Maryland, for Petitioner.

Melvin Bergman, Beltsville, MD, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

The Attorney Grievance Commission filed a Petition for Disciplinary Action against the respondent, Alan C. Drew. We referred the matter to Judge Marjorie L. Clagett of the Circuit Court for Calvert County for hearing. The substance of Judge Clagett's findings and conclusions are set forth below.

"The Respondent was admitted to practice law in Maryland on June 16, 1976. ... He specialized in bankruptcy and criminal law although he also did some personal injury and domestic law. By 1981, he had narrowed his practice to bankruptcy and criminal law. At one point, bankruptcy cases accounted for 40% of his practice. In fact, he was a member of the bankruptcy trustee panel. As part of his bankruptcy practice, Mr. Drew set up post-petition plan procedures for his bankruptcy clients wherein they would send their payments to him and he would write checks to the various lenders. He did this to help his clients and assure that the plan worked for them. This created a large volume of transactions in his client escrow account. Around 1991 (as a result of this case and perhaps a little earlier), Mr. Drew phased out his bankruptcy practice. Presently he devotes his entire practice to criminal defense work.

. . . .

"The core of this disciplinary action against Mr. Drew is his use and management of his escrow account. All parties concede the Respondent clearly did not handle the account properly. Prior to 1989, the Respondent received a warning from the Attorney Grievance Commission as a result of his failing to promptly disburse monies from his escrow account and his failure to advise his clients about the procedure to pay post plan monies. In response to this warning, the Respondent hired a part-time bookkeeper. The bookkeeper along with the Respondent's secretary (and later the secre-

tary alone) handled all deposits and withdrawals from the account. It was their job to ensure proper accounting and timely disbursements of the escrow funds. Unfortunately, after an initial 'training period' the Respondent exercised virtually no supervision of his employees. This lack of supervision ultimately resulted in this complaint.

## "DENA SPAIN COMPLAINT

### "Findings of Fact

"In December, 1989, Dena Spain, a U.S. Postal Service employee, consulted the Respondent regarding the pending foreclosure on her home. After the initial consultation, Ms. Spain hired the Respondent to file a Chapter 13 Bankruptcy on her behalf. As a result of this filing, Ms. Spain was able to stay the foreclosure on her home. To insure proper documentation of her mortgage payments, the post-petition plan was to have Ms. Spain pay her monthly mortgage payments to Mr. Drew's office so that he could deposit them in his escrow account and forward them to the lender, Goldome Realty Credit Corporation (hereinafter, 'Goldome'). Mr. Drew not only explained the post-petition plan personally to Ms. Spain but he sent her a letter detailing what she had to do. Ms. Spain's checks were to be made payable to Alan C. Drew.

"Almost immediately, problems arose. Ms. Spain did not make timely payments (at the first of each month). In addition, she failed on several occasions to have the checks paid to the order of Alan C. Drew. Instead they were drawn from her Credit Union made payable to her. She then did not endorse the checks therefore making them non-negotiable by either Mr. Drew or the lender. Rather than having Ms. Spain reissue the checks, Mr. Drew's staff forwarded at least three unendorsed checks to Goldome. Of course, when the checks were received by Goldome they were sent back for the proper endorsement. This course of action caused delay which, according to Goldome's records,

resulted in an arrearage and in the lender requesting a lift of the stay.

"On July 30, 1990, Goldome filed a Motion to Modify Stay to Permit Foreclosure of the Deed of Trust so as to allow it to proceed with the foreclosure. To avoid this new foreclosure action, Mr. Drew, after consultation with Ms. Spain, negotiated a consent order wherein in addition to her regular payments, Ms. Spain would pay the arrearage of $2,971.44 by November 9, 1990. A provision within the Consent Order provided for a lift of the stay if the debtor defaulted on these terms. While an agreement was reached to stave off the lifting, the *laissez-faire* supervision continued and once again the lender sought to lift the stay.

"On December 10, 1990, Goldome filed an Affidavit of Default alleging an arrearage of $6,815.75 which was due in part to two checks which were returned 'stopped payment' and failure on Ms. Spain's part to repay the $2,971.44 arrearage by November 9, 1990. No answer was filed within the ten day period and the Stay was lifted. If Respondent had checked Ms. Spain's escrow account balance at that time it would have shown a balance of $4,585.41. Both Respondent and Ms. Spain agree there was no communication between them from November of 1990 to March of 1991.

"In March of 1991, Ms. Spain, who was about to go into the hospital, received notification of the sale of her home. In a panic, she called Mr. Drew who told her not to worry. He advised her to allow the sale to proceed after which he would file exceptions to the sale. Concerned, Ms. Spain engaged the services of another attorney. In a letter dated March 22, 1991 she wrote the Respondent terminating his services and requesting an accounting of her account. The Respondent testified he did not recall seeing the termination letter of March 22, 1991.

"Mr. Drew continued to represent Ms. Spain despite the letter. He filed an Objection to the Sale in the Circuit Court for Prince George's County. Ms. Spain's new counsel and Mr. Drew were present for the hearing before Judge

G.R. Hovey Johnson. Mr. Drew testified it was he who presented the argument to the Court. The Circuit Court felt the proper forum for the matter was the Bankruptcy Court. Mr. Drew on behalf of Ms. Spain filed a Motion to Reconsider Lifting Automatic Stay and a Request for Emergency Hearing in Bankruptcy Court. Judge Mannes on the U.S. Bankruptcy Court for the District of Maryland denied the Reconsideration with a margin note that the time for the appeal had run. In both the Objection to Sale and Motion for Reconsideration the Respondent alleged Ms. Spain had in fact made her payments as ordered and that he was holding $7,177.63 in trust for her. Mr. Drew then went back to Circuit Court for a rehearing on the Objection to Sale. Unfortunately, the Circuit Court finding no fault with the sale ratified it. Ms. Spain lost her home.

"In a letter dated October 7, 1991, Ms. Spain again wrote to the Respondent demanding an accounting and return of her money which the Respondent had in escrow. Mr. Drew authorized his bookkeeper to prepare a refund of $7,177.63. The refund check, signed by Respondent and drawn on his escrow account, was returned for insufficient funds. By chance, the Respondent discovered the notice of dishonor himself. (He testified that he normally did not open and post his mail). Upon discovering the dishonor, he immediately called Ms. Spain. He subsequently paid her $7,177.63 by cashiers check. Based on the handling of her case, Ms. Spain filed this grievance against Mr. Drew.

"In response to Ms. Spain's complaint, John Reburn, Attorney Grievance Commission investigator, was assigned to review and analyze Mr. Drew's escrow account. This review led to the opening of a 'Pandora's Box.' The Respondent was unable to produce his ledgers and account files for the past five years. After several months, Mr. Reburn obtained the necessary bank records, escrow ledger cards and payment records from Goldome to allow him to reconcile Mr. Drew's account. Mr. Reburn prepared a detailed spreadsheet of the running balance of the account from November 30, 1989 to May, 1991. What he discovered

was quite disturbing. The escrow account was in complete disarray.

"The account was quite active—over 900 transactions over the two years or 2–3 per working day during the time period. The cumulative deposits and credits for 1990 and 1991 were $254,560.57 and $126,306.26, respectively. Mr. Drew failed to track funds to make sure that they were properly disbursed. Mr. Drew admitted he provided little or no supervision over his escrow account. He would periodically review client ledger cards and when he felt he had earned a fee, he would instruct the bookkeeper to write him a check. He never checked the account balance to determine if there were sufficient funds to cover the check. On one occasion, one such fee check was returned for insufficient funds. This should have raised a 'red flag,' however, it did not, despite the Respondent's testimony that he must have known that the check was not honored. Other disturbing factors concerning the account were twenty-three bank charges for overdrafts and non-sufficient funds; 'draw' checks totalling $3,281.25 taken from the office account and deposited to the escrow account; and 'fee' checks totaling $26,161.91, drawn by the Respondent, with no corresponding deposits to support them. The most troubling of such 'fee' checks were three checks totaling $10,800.00 from 'Dr. Jones' with no supporting documentation as to deposits. Mr. Drew testified the Jones's were long time clients. He represented Dr. Jones, his wife Agnes, and her son in a variety of legal matters including personal injury cases and criminal cases. He produced one client ledger sheet purporting to be a criminal case for the son with a $3,000.00 retainer. Mr. Drew, however, could not produce the other ledger cards but adamantly testified he never took money from the escrow account that did not belong to him. After complete reconciliation of the account Mr. Reburn found Mr. Drew still owed Ms. Spain $1,292.44.

"The Court finds, by a preponderance of the evidence, several mitigating factors. Mr. Drew is a workaholic. The Courts have found alcoholism and drug dependency to be

mitigating factors in the past. This Court finds Mr. Drew's compulsive work habits to be of the same nature. As a solo practitioner, the sheer volume of his criminal practice coupled with his bankruptcy work left him little time for office supervision. In 1990, during the time of his representation of Ms. Spain, he was involved in complex criminal cases, one in Baltimore involving 12 lawyers which lasted 4 1/2 months. He found himself in trial four out of five days. From November, 1989 to November, 1991, he never looked in the escrow book. He relied on his staff and signed the checks they presented to him.

"His personal life also contributed to the stress of his already hectic professional life. He separated from his first wife in 1983. He described the marriage as tumultuous; the separation caused alienation with his children and his parents. The custody and visitation problems are still ongoing. He remarried in 1985. He sought counseling from a clinical psychologist from 1988 for depression and stress and sought the services of a psychiatrist from 1990–1991. He stayed in treatment with the psychologist until 1992.

"By 1992 he phased out the bankruptcy work and now devotes his legal time exclusively to criminal work and thus has little use for escrow accounts. His escrow account now involves only restitution payments and transcript costs. He personally monitors every single transaction.

## "Conclusions of Law

"It is alleged that Mr. Drew violated **Rules 1.1 Competence, 1.3 Diligence, 1.4 Communication, 5.3 Responsibilities Regarding Nonlawyer Assistants.** [Text of Rules omitted.]

"It is the conclusion of the Court, by clear and convincing evidence, that the Respondent did violate **Rules 1.3, 1.4 and 5.3** of the Rules of Professional Conduct by failing to act with reasonable diligence and promptness in his representation of Ms. Spain, by failing to communicate with her sufficiently, by failing to keep her apprised of her legal situation, and by his total abdication of his supervising responsibility to his staff. It is clear that the Respondent

began his representation of Ms. Spain in a proper fashion. He competently filed Ms. Spain's Chapter 13 bankruptcy and successfully obtained a consent order to stave off a second impending foreclosure of her home. Unfortunately as a result of his inattention to the supervision of his staff, he failed to realize Ms. Spain had a credit balance in December of 1990 and thus had a valid defense to the Default action. He failed to communicate with her upon receipt of the Affidavit of Default. As a result of this lack of communication and diligence, by the time of the foreclosure in March of 1991 it was too late to save Ms. Spain's home. Clearly, Mr. Drew was at fault, however, Ms. Spain must share in some of the blame. Thus, the Court cannot find, by clear and convincing evidence, that Mr. Drew violated **Rule 1.1.**

"The heart of this action is the alleged violation of **Rule 1.15 Safekeeping Property, Rule 8.4 Misconduct,** as well as **Business Occupations and Professions Article § 10–306, Misuse of Trust Money,** and **Rule BU9 Prohibited Transactions.** [Text of Rules omitted.]

"All parties concede and the Court finds by clear and convincing evidence that the Respondent violated **Rule 1.15(a), (b),** and **(c).** In addition, the Court finds that the Respondent violated **Business Occupations and Professions Article § 10–306** as well as **Rule 8.4(a).** Mr. Drew's escrow account was not properly maintained nor did he keep the appropriate records and documentation for the required five year period. It is uncontroverted that the Respondent's escrow account was 'inexcusably terrible.' His accounting procedures were deficient in a number of respects. First, the transfer of funds between his office account and escrow account were not sufficiently precise to comply with the standards of an escrow account. Second, the records were not maintained with the proper care required. Third, when Ms. Spain asked for an accounting, he failed to do so. Fourth, for a period of at least two years, Mr. Drew did not keep clients' funds separately; he took fees when there were insufficient funds in the account to cover them; he took fees when there were no supporting deposits or credits;

he transferred funds from his business account to his escrow account and wrote checks on behalf of clients when there was a negative balance in the account. Given the number of bank charges for insufficient funds and overdraft charges the Respondent clearly should have been on notice that there was a problem. The Court's review of Mr. Drew's escrow account reveals that there were numerous times when the balance in Ms. Spain's account fell below the amount that was held in trust for her. Clearly, her funds were being used to fund other client's interests and for fees to Mr. Drew. The ultimate proof of the complete state of disarray was the fact that Mr. Drew's refund check to Ms. Spain was not honored by the bank. The Court finds Bar Counsel's investigator's testimony concerning the balance owed to Ms. Spain to be correct; thereby finding that Mr. Drew still owes Ms. Spain $1,292.44.[1]

"The Court does not find that Mr. Drew violated **Rule 8.4(c) or (d) Misconduct** or **Rule BU9 Prohibited Transactions.** Despite the fact that the escrow account was in total confusion, there was no evidence of any actual loss to any other client with the exception of the $1,292.44 owed to Ms. Spain by virtue of the negative balances in the account. Although there was ample evidence of lack of supervision and inefficiency in his accounting practices, there was no clear and convincing evidence of intentional misappropriation on Mr. Drew's part. As a result of his sloppy accounting practices and Bar Counsel's introduction of bank records for only two years, it was difficult to determine exactly the source of funds from which the Respondent took a fee. However, the Court accepts Mr. Drew's explanation, despite being unable to produce the entire underlying supporting documentation, that all fees taken were earned.

### "SUMMARY

"Bar Counsel argues that due to these violations, Mr. Drew's mismanagement of his staff and escrow account

---

1. After the hearing before this Court, Mr. Drew reimbursed the $1,292.44 to Ms. Spain.

rises to the level of intentional, gross and wanton negligence. The Court, however, disagrees. Although the number of transactions in the escrow account were staggering and the balances often not sufficient to cover specific individual client's accounts, the Court did not find the Respondent intentionally ever took a fee or requested a check to be paid on behalf of a client to which he was not entitled or that he knew the balance would not cover. The Court accepts the Respondent's testimony that due to his criminal trial schedule, personal family stress and complete (but misplaced) reliance on his staff, he did not concern himself with the daily operation of his office, however, his motives were honest."

Respondent filed no exceptions. Bar Counsel has excepted, principally asserting that "workaholism" is not mitigating and that Judge Clagett clearly erred in failing to find violations of Maryland Rule BU9 and of Rule of Professional Conduct (RPC) 8.4(c) and (d).

■ This Court has never considered that an attorney's decision to take on more work than the attorney could properly handle was a mitigating factor. In *Attorney Grievance Comm'n v. Howard*, 282 Md. 515, 385 A.2d 1191 (1978), we viewed taking on too much work as "poor judgment." *Id.* at 524, 385 A.2d at 1196. Acceptance of "workaholism" as an excuse for lack of diligence would effectively gut RPC 1.3. Judge Clagett's finding that workaholism is a mitigating factor is clearly erroneous.

Maryland Rule BU9 prohibits an attorney from using "any funds required by these Rules to be deposited in an attorney trust account . . . for any unauthorized purpose." Judge Clagett was apparently of the view that Mr. Drew had not violated Rule BU9 because his invasions of trust funds were unintentional. That interpretation has no support in the language of the rule or in the rule's purpose. Bar Counsel's exception as to Rule BU9 is sustained. We shall also assume, *arguendo,* that anytime an attorney overdraws a client's escrow account the attorney's conduct is prejudicial to the

administration of justice in violation of RPC 8.4(d). But, the violation of Rule BU9 and the assumed violation of RPC 8.4(d) simply cumulate labels for the same underlying conduct. Multiplying violations based on the same conduct does not substantially alter the sanction analysis. ·

A substantial alteration of the sanction analysis would be effected if Bar Counsel were correct in contending that Judge Clagett was clearly erroneous in failing to find that Mr. Drew "engage[d] in conduct involving dishonesty, fraud, deceit or misrepresentation," in violation of RPC 8.4(c). We cannot conclude, however, that Judge Clagett was clearly erroneous. Our review is not based on what finding we would make on the same evidence. Further, deference must be given to Judge Clagett's opportunity to see and hear the witnesses, and to the requirement that professional conduct violations must be proved by clear and convincing evidence. Bar Counsel's exception as to RPC· 8.4(c) is denied.

■ We now address the appropriate sanction. This Court has consistently found that "[t]he misappropriation by an attorney of funds of others entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct." *Bar Ass'n v. Marshall,* 269 Md. 510, 519, 307 A.2d 677, 682 (1973); *Attorney Grievance Comm'n v. McBurney,* 283 Md. 628, 631, 392 A.2d 81, 82 (1978).

Both *Marshall* and *McBurney,* however, are *intentional* misappropriation cases. Marshall obtained a fee from a client in a workers' compensation case before it was approved by the Workers' Compensation Commission. *Marshall,* 269 Md. at 513, 307 A.2d at 679. Subsequently, when the Commission approved a fee and submitted the fee to him, Marshall kept that second fee payment as well, refusing to make a refund to the client. *Id.* at 513–14, 307 A.2d at 679–80. McBurney denied receipt of insurance settlement funds belonging to a client and deposited the funds in his office rather than his escrow account. *McBurney,* 283 Md. at· 629–30, 392 A.2d at 82.

*Marshall* indicates that the intentional misappropriation was key to the determination to disbar. We said:

> "[W]hen a member of the bar of this Court is found to have betrayed the high trust imposed in him by appropriating to his own use funds of others entrusted to him, *as Marshall did,* then, absent the most compelling extenuating circumstances, which we do not find to be present here, disbarment should follow as a matter of course."

269 Md. at 520, 307 A.2d at 682 (emphasis added). What Marshall did was intentionally to misappropriate. That is not the finding in the instant matter.

In *Attorney Grievance Comm'n v. Bakas,* 323 Md. 395, 593 A.2d 1087 (1991), the misappropriation was intentional. Bakas deposited funds from an insurance settlement in his escrow account and for a period of four and one-half months drew checks for personal and professional purposes. *Id.* at 397–98, 593 A.2d at 1088–89. Bakas failed to pay the client's medical bills and, as a result, the client was sued for nonpayment. *Id.* at 398, 593 A.2d at 1089. Over a dissent by Judge Bell, joined by two other judges, the Court took into account "the nature and gravity of the misappropriation and the relatively short period during which Bakas's escrow account was in arrears...." *Id.* at 403–04, 593 A.2d at 1091–92. Judge Bell reminded the Court that unless the offending attorney could demonstrate "compelling extenuating circumstances," the appropriate sanction was disbarment. *Id.* at 404–05, 593 A.2d at 1092 (Bell, J., dissenting).

*Attorney Grievance Comm'n v. Goldberg,* 292 Md. 650, 441 A.2d 338 (1982), was primarily a neglect case in which the attorney was suspended for thirty days. *Id.* at 651, 658, 441 A.2d at 339, 342. Goldberg failed to file numerous pleadings, to record deeds, and to disburse funds collected for clients in a timely manner. *Id.* at 653, 655–56, 441 A.2d at 340, 341. In addition there were escrow account overdrafts, due principally to the irresponsibility of the office manager. *Id.* at 655–56, 441 A.2d at 341. There was no indication that drawing of fees from the escrow account caused overdrafts.

Respondent's case is most similar to *Attorney Grievance Comm'n v. Berger,* 323 Md. 428, 593 A.2d 1103 (1991) and 326 Md. 129, 604 A.2d 58 (1992), where the circuit judge found that the misappropriation was not intentional. Berger's practice was to deposit all fees he earned in his escrow account and, later, to make periodic withdrawals. 323 Md. at 430, 593 A.2d at 1105. Similar to Drew's "eyeballing" of ledger sheets, Berger kept a tally sheet for each client from which he subtracted fees as they were drawn. *Id.* at 431, 593 A.2d at 1105. Frequently he did not identify the client against whom they were drawn. *Id.* at 430–31, 593 A.2d at 1105. And, he did not reconcile bank statements. *Id.* at 432, 593 A.2d at 1106. The hearing judge found that, while Berger's acts amounted to " 'gross and wanton negligence amounting to a total disdain and disregard for his duties to safeguard his client's money,' " she "could not find by clear and convincing evidence, that Berger knowingly misappropriated client funds." 326 Md. at 130–31, 604 A.2d at 58. The escrow violations were Berger's first reported violation in twenty years of practice, involved only one client, and there was no indication that the client suffered harm in any way. Berger was suspended indefinitely with the right to reapply after one year and upon having an approved monitor for the escrow. *Id.* at 131, 604 A.2d at 59.

We again considered escrow accounts in *Attorney Grievance Comm'n v. Kramer,* 325 Md. 39, 599 A.2d 100 (1991). Kramer and Mirsky, a business associate, were in the mortgage brokering business, putting together borrowers and lenders. As part of the business, Kramer, in his capacity as an attorney, drew up deeds of trust and conducted settlements. Things went well from 1980 until 1983 when Kramer discovered that Mirsky had used borrowers' repayments unsuccessfully to speculate in the stock market. *Id.* at 43–45, 599 A.2d at 102–03. Earlier, in 1982, apparently overwhelmed by personal problems, alcoholism, and a failed second marriage, Kramer precipitously left town and moved to Georgia. *Id.* at 45, 599 A.2d at 103–04. While he was in Georgia funds were withdrawn from the Maryland escrow account. *Id.* at 51–52, 599

A.2d at 107. At some point he authorized his father to close out the accounts and distribute funds. *Id.* at 51, 599 A.2d at 106. In the end, Kramer did not know what had happened to the escrowed funds and he had no records. *Id.* at 49–51, 599 A.2d at 105–07. The Court made the following observation:

> "Not only did Kramer fail to maintain any records or render any accounting of funds that were in his escrow account, he doesn't know what became of the money. Such conduct, coupled with his cavalier attitude about his missing records, is at least gross negligence and unacceptable for a member of the bar. 'Fiduciaries in general, and attorneys in particular, must remember that the entrustment to them of the money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds.'"

*Id.* at 51, 599 A.2d at 106–07 (citation omitted). Kramer was given an indefinite suspension with the right to reapply after one year. *Id.* at 54, 599 A.2d at 108.

Another unintentional misappropriation case is *Attorney Grievance Comm'n v. Powell*, 328 Md. 276, 614 A.2d 102 (1992). Powell's secretary had misdeposited funds into Powell's operating account rather than into his escrow account. *Id.* at 288–89, 614 A.2d at 108–09. The Court found that Powell failed to check his bank statements or to supervise his employees notwithstanding his having notice that the employees were "not . . . the brightest," and that there had been several prior misdeposits. *Id.* at 293–95, 614 A.2d at 111–12. Finding Powell's conduct similar to that of Berger and Kramer, the Court noted that the violations were Powell's first and involved just one client. *Id.* at 295, 301, 614 A.2d at 112, 115. Taking into account personal problems, Powell was suspended indefinitely with the right to reapply after six months. *Id.* at 302, 614 A.2d at 115.

*Attorney Grievance Comm'n v. Owrutsky*, 322 Md. 334, 587 A.2d 511 (1991), from which Drew seeks to distinguish himself, presented several escrow violations more serious than those of Drew. Owrutsky wrote checks when there were insufficient

funds in the escrow account, *id.* at 345, 587 A.2d at 516, and took fees before they were earned and/or before approval by the Orphans' Court. *Id.* at 340–41, 587 A.2d at 514. He also kept estate funds in his escrow account rather than setting up a separate account for the estate. *Id.* More important, Owrutsky made loans from the estate funds to himself and friends. *Id.* at 346–54, 587 A.2d at 517–20. Owrutsky, who had practiced for almost thirty years without any record of misconduct, was suspended for three years. *Id.* at 355–56, 587 A.2d at 521.

Based on the comparability to *Berger* and *Kramer* we determine that the appropriate sanction is an indefinite suspension, without any right to apply for reinstatement for a period of one year from the beginning of the suspension. Accordingly, we shall enter the following order:

1. Drew is indefinitely suspended from the practice of law, effective thirty days after the filing of this opinion.

2. Drew shall:

(a) Within five days from the date of filing of this opinion provide Bar Counsel with the names and addresses of Respondent's current clients and identify client matters currently pending in court; and

(b) Within fifteen days from the date of filing of this opinion provide Bar Counsel with a copy of a letter mailed by Drew to each such client, and to counsel for any adverse party or to any unrepresented adverse party, notifying them of this indefinite suspension.

3. Drew may apply for reinstatement not earlier than one year from the effective date of this suspension and upon having satisfied Bar Counsel that the following conditions have been met:

(a) Drew shall have engaged, at his expense, a monitor, acceptable to Bar Counsel, who will oversee Drew's accounting for funds entrusted to him, subject to further order of this Court;

(b) Drew shall have complied with ¶ 2 of this order; and

(c) Drew shall have paid all costs assessed pursuant to the mandate in this matter.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST ALAN C. DREW.*