*Attorney Grievance Commission of Maryland v. Benjamin Jeremy Woolery*, Misc. Docket AG No. 20, September Term, 2017.  Opinion by Greene, J.

**ATTORNEY GRIEVANCE — DISCIPLINE — DISBARMENT**

The Court of Appeals held that disbarment is the appropriate sanction when an attorney's protracted involvement in an estate case resulted in, among other violations, a conflict of interest, mishandling of funds belonging to the estate, multiple misrepresentations to the court as well as his clients, and frivolous litigation.  Respondent Benjamin Jeremy Woolery violated Rules 1.1 (Competence), 1.2(a) (Scope of Representation and Allocation of Authority Between Client and Attorney), 1.4(a) and (b) (Communication), 1.5(a) (Fees), 1.7(a) and (b)  (Conflict of Interest), 1.9(a) (Duties to Former Clients), 1.15(a) and (d) (Safekeeping of Property), 1.16(a) and (d) (Declining or Terminating Representation), 3.1 (Meritorious Claims and Contentions), 3.3(a) (Candor Toward the Tribunal), 7.3(a) (Direct Contact with Prospective Clients), and 8.4(a), (c) and (d) (Misconduct).

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 20

September Term, 2017

_____

ATTORNEY GRIEVANCE
COMMISSION OF MARYLAND

v.

BENJAMIN JEREMY WOOLERY

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Greene, J.

_____

Filed: December 20, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This attorney discipline case traces the protracted plight of one man's estate administration. When Freelove Jefferies died in February 2012, he left behind two executed wills. His longtime friend Ronald Hutchens promptly sought the assistance of Respondent Benjamin Jeremy Woolery (Respondent or "Mr. Woolery") to handle opening an estate on behalf of Mr. Jefferies. Mr. Woolery, who was admitted to practice law in Maryland on December 16, 1988, focused his law practice primarily in the area of estates and trusts. Nevertheless, Mr. Woolery's involvement in the administration of Mr. Jefferies's Estate, which spanned several years, led the Attorney Grievance Commission ("Bar Counsel" or "Petitioner") to file a "Petition for Disciplinary or Remedial Action" against Mr. Woolery.

On July 27, 2017, Bar Counsel filed, pursuant to Maryland Rule 19-721, a petition in which it alleged that Mr. Woolery committed violations of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") based on conduct that occurred before July 1, 2016.[1] Specifically, Bar Counsel alleged that Respondent violated Rules 1.1 (Competence), 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer), 1.4 (Communication), 1.5 (Fees), 1.7 (Conflict of Interest), 1.9 (Duties to Former Clients), 1.15 (Safekeeping of Property), 1.16 (Declining or Terminating Representation), 3.1

---

[1] On July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and codified in Title 19 of the Maryland Rules. Bar Counsel alleged that Respondent's misconduct occurred both prior to July 1, 2016 and after July 1, 2016. At the time of Bar Counsel's filing on July 27, 2017, the Rules were codified as MARPC. Although the majority of Respondent's conduct occurred prior to July 1, 2016, for purposes of consistency, we shall refer to the Rules as they are currently codified as MARPC in the Discussion section of this Opinion.

(Meritorious Claims and Contentions), 3.3 (Candor Toward the Tribunal), 7.3 (Direct Contact with Prospective Clients), and 8.4 (Misconduct). Bar Counsel also alleged that Respondent's acts after July 1, 2016 violated Maryland Attorneys' Rules of Professional Conduct ("MARPC") 19.303.1 (Meritorious Claims and Contentions) as well as MARPC 19.308.4 (Misconduct).

Upon this Court's referral of the matter to the Circuit Court for Prince George's County, the Honorable William A. Snoddy conducted a four-day evidentiary hearing on April 9 – 12, 2018. As a result of that hearing, Judge Snoddy issued Findings of Fact and Conclusions of Law, in which he found by clear and convincing evidence that Respondent's acts violated MLRPC 1.1, 1.2, 1.4, 1.5, 1.7, 1.9, 1.15, 1.16, 3.3, 7.3, and MARPC 3.1 and 8.4. For the reasons explained herein, we conclude that the evidence admitted at trial clearly and convincingly supports the hearing judge's conclusions of law as to violations of the Rules.

## FINDINGS OF FACT

The following summary of pertinent facts is derived from Judge Snoddy's thorough Findings of Fact. As a backdrop to the allegations against Respondent, Judge Snoddy found that Respondent is a junior partner in the law firm of McGill and Woolery, where he focuses his practice primarily in the area of estates and trusts. Additionally, Respondent is the chairman of the Prince George's County Bar Association's Estates and Trusts Committee, and he has developed a reputation as an experienced and trustworthy attorney in the area of probate, trusts and estates.

- 2 -

*Initial Representation*

Ronald Hutchens ("Mr. Hutchens") sought Respondent's assistance in opening and administering the estate of Mr. Hutchens's longtime friend, Freelove Jefferies ("Mr. Jefferies"). At the time of his death, Mr. Jefferies was widowed. Mr. Hutchens had been a caretaker for Mr. Jefferies prior to his death. On February 22, 2012, Mr. Hutchens met with Respondent to discuss Mr. Jefferies's Estate and at that time gave Respondent a check payable to Respondent's law firm in the amount of $1,000.00 as an initial fee. On February 24, 2012, Mr. Hutchens memorialized Respondent's representation in a written Retainer Agreement which included a statement that "Charges will be made to and paid by the Estate." Respondent explained to his client that the legal fees would be paid from the Estate, and he estimated that his charges would be "about $5,000.00." At this time, both Respondent and Mr. Hutchens anticipated that Mr. Hutchens would be appointed as Personal Representative of the Estate because Mr. Hutchens had been nominated as such in one of Mr. Jefferies's wills.

On the same day that Mr. Hutchens signed the retainer agreement, Respondent filed a Regular Estate Petition for Administration on behalf of Mr. Hutchens. Respondent's estimation of the value of real property reflected Respondent's knowledge of two parcels of real property, both unimproved, and a third parcel of real property located at 13201 Old Indian Head Road in Brandywine, Maryland, which contained a house ("Brandywine

- 3 -

property").[2] Respondent knew that a tenant lived in the Brandywine house, and he had copies of the lease agreement for the rental property.

Mr. Jefferies left two signed wills. One of the wills, executed on November 6, 2007 ("the 2007 will"), had been held by the Register of Wills for Prince George's County. Respondent sought to probate Mr. Jefferies's second will, which had been executed on May 1, 2008 ("the 2008 will"), when he filed the Regular Estate Petition for Administration. On February 24, 2012, the same day that Respondent filed the Regular Estate Petition for Administration, Mr. Jefferies's granddaughter, Deidre Jeffries, also filed a petition for administration of Mr. Jefferies's Estate and requested that any wills and codicils be admitted to judicial probate. Ms. Deidre Jefferies was not named as a legatee in the 2008 will and was bequeathed $1.00 under the 2007 will. Mr. Hutchens, on the other hand, had been nominated to serve as the personal representative in the 2007 will and was named in the 2008 will as the alternate personal representative behind an attorney who had predeceased Mr. Jefferies.

The Register of Wills neither named Mr. Hutchens as personal representative, nor appointed him special administrator for the estate. In May 2012, Ms. Deidre Jefferies challenged Mr. Jefferies's competency and asserted that Mr. Hutchens procured the wills by the exercise of undue influence and/or fraud. In her Petition to Caveat and Petition for Appointment of Special Administrator, filed in the Orphans' Court for Prince George's County, Ms. Jefferies sought a declaration that the wills were invalid and that the Court

---

[2] Respondent placed an approximate value of $950,000.00 on the real property of Mr. Jefferies's Estate.

find that Mr. Jefferies died intestate. She also requested that Mr. Hutchens answer the petition.

On June 14, 2012, the Orphans' Court for Prince George's County appointed Justin Sasser, Esq., as special administrator of the Jefferies Estate.[3] In that role, Mr. Sasser was responsible for, among other duties, marshalling the assets of the estate. Judge Snoddy found that "by virtue of his probate experience, [Respondent] was also aware of Sasser's responsibilities as special administrator."

Respondent knew of and had access to the Estate's assets through Mr. Hutchens. For example, Respondent knew that Mr. Hutchens collected weekly cash rent payments of $150.00 from the tenant of the Brandywine property. Additionally, Respondent knew that at the time of Mr. Jefferies death, he had a savings account at Prince George's Federal Savings Bank ("PGFSB"), which had a balance of $1,590.56 on February 21, 2012. Respondent knew of the existence of the bank account because PGFSB sent the account statements to the Respondent's firm's address. Additionally, Respondent received a $150.00 cash rent payment as well as a tax refund check issued to Mr. Jefferies, and Respondent deposited both amounts in the account for a total of $2,995.00. Respondent's firm continued to receive monthly bank statements at the firm address through May 2013. Despite Respondent's knowledge of these assets of the Jefferies Estate, Respondent did not

---

[3] Maryland Code Ann., Estates and Trusts Article, § 6-401(a) (1974, 2017 Repl. Vol.) provides that "a special administrator may be appointed by the court whenever it is necessary to protect property prior to the appointment and qualification of a personal representative or upon the termination of appointment of a personal representative and prior to the appointment of a successor personal representative."

promptly notify Mr. Sasser of the existence of the assets or the records in his possession. Judge Snoddy found that the earliest date Respondent sought to disclose information about the bank account's assets was two months after Mr. Sasser's appointment as special administrator on or about August 7, 2012. In addition, despite his knowledge that Mr. Hutchens and/or another individual named William Watson ("Mr. Watson") had been collecting the weekly rent payments from the tenant in the Brandywine property, both prior to and after the death of their friend Mr. Jefferies, Respondent failed to inform Mr. Sasser about the rent collection. Respondent also failed to advise Mr. Sasser that Mr. Hutchens and Mr. Watson performed maintenance at the rental property. As special administrator, Mr. Sasser should have been informed of the existence of Estate assets, and those assets should have been accounted for in an Estate bank account. *See* § 6-403 of the Estates and Trusts Article, Md. Code Ann. (1974, 2017 Repl. Vol.) (stating that a special administrator assumes generally the duties unperformed by a personal representative and has all powers necessary to collect, manage, and preserve property of the Estate).

*Respondent's Evolving Representation*

Although Respondent's representation of Mr. Hutchens should have been limited to defending the caveat petition filed by Ms. Deidre Jeffries, his involvement in the case during the next year evolved to include matters well beyond defending the caveat petition. For example, when Mr. Sasser missed the deadline for filing an Inventory and an Information Report, Respondent prepared the documents, signed them "Attorney" and "passed them on to Sasser, who reviewed them and signed as special administrator."

- 6 -

Respondent was not Mr. Sasser's attorney at the time of preparation of these documents in April 2013.

In the litigation involving Ms. Deidre Jefferies's caveat petition, Respondent persisted in advancing the position that his client, Mr. Hutchens, was the "de facto Personal Representative" of the Jeffries Estate. For example, Respondent sent a letter to an attorney in November 2012 in which he referred to Mr. Hutchens as "the de facto Personal Representative." Mr. Sasser had been appointed special administrator five months earlier.

In April 2013, Respondent filed a Small Estate Petition for Administration on behalf of Mr. Hutchens for the purpose of opening an estate for Mr. Jefferies's deceased wife. Respondent sought to access the decedent's bank account to pay the property taxes for four properties that were on the verge of being lost to tax sales.[4] Although Respondent sought to have Mr. Hutchens appointed as the Personal Representative of Mrs. Jefferies's Estate, he also filed on the same day a Petition for Appointment as Special Administrator in which he requested that he be appointed special administrator of Mrs. Jefferies's Estate. In his filing, Respondent referred to Mr. Hutchens as the "nominated Personal Representative for this Decedent's surviving spouse Freelove Jefferies." By the date of his filing, though, Respondent knew that Mr. Hutchens had not been appointed personal representative of Mr. Jefferies's Estate, and, in fact, knew that Mr. Sasser had been appointed special

---

[4] By the time Respondent prepared the Inventory and Information Report, in April of 2013, Respondent knew of four parcels of real property owned by Mr. Jefferies. In contrast to his previous estimations when he filed the Regular Petition for Estate Administration and knew of three properties that he valued at $950,000.00, Respondent changed the estimated value of four properties to only $358,800.00.

administrator of Mr. Jefferies's Estate. He also knew that Mr. Hutchens had not yet been appointed Personal Representative of Mrs. Jefferies's Estate.

In May 2013, Respondent identified himself as "Counsel for the Estate of Freelove Jefferies" in correspondence to counsel for the tax sale purchaser of a previously unknown fifth parcel of land owned by Mr. Jefferies. With respect to this reference of "Counsel for the Estate of Freelove Jefferies," Judge Snoddy found that "[a]t the time the Respondent wrote to [counsel], he did not represent the special administrator nor was he otherwise counsel for the Estate of Freelove Jefferies." The hearing judge also found that Mr. Sasser, the special administrator at the time, had not authorized, nor delegated to, Respondent the task of managing the Estate's assets.

Just before a hearing on June 20, 2013 in the Orphans' Court, Respondent sought to represent Mr. Watson, who was a legatee under both wills. Mr. Watson was, like Mr. Hutchens, a longtime time friend of Mr. Jefferies, and Mr. Watson helped Mr. Hutchens with the maintenance of the Brandywine property. Respondent's stated goal of representation of Mr. Watson was to present a "unified front at trial." Mr. Watson did not immediately accept Respondent's offer. At the hearing on that day, the Orphans' Court appointed Mr. Sasser as personal representative of the Jeffries Estate on a strictly *pro forma* basis. The appointment "lasted but a few seconds at which time the Court suspended [Mr.] Sasser's duties as P[ersonal] R[epresentative] and restored him to the role of special administrator of the estate." Nevertheless, the very next day, Respondent wrote to Mr. Sasser and addressed him as the "newly-appointed Personal Representative." In that letter, Respondent noted the "'looming' legal costs" but failed to alert Mr. Sasser that Mr.

- 8 -

Hutchens had delivered to Respondent, that same day, rent money from the tenant at the Brandywine property in the amount of $900.00. Respondent deposited the $900.00 into his law firm's attorney trust account.[5] He did not turn over the money to Mr. Sasser.

In September 2013, Mr. Watson formally retained Respondent to represent him in defending Mr. Jefferies's wills and other matters related to the Estate. The retainer agreement provided that Respondent would represent Mr. Watson "to defend both of Freelove Jefferies' 'wills'; use Ron's lot & proceeds therefrom to pay [Mr.] Woolery, and hopefully Mr. Watson c[ould] get his lot(s) from [the] Estate without paying [Mr.] Woolery." The agreement contained a clause that Respondent's representation would be in consideration of "$1.00." The next day, September 10, 2013, Mr. Sasser, as special administrator, notified the other attorneys in the case that he intended to hire Respondent to defend the will in the caveat proceeding brought by Ms. Jefferies. After receiving no opposition from the interested parties, Mr. Sasser formally retained Respondent for representation of the Estate in the caveat proceeding. Mr. Sasser did *not* retain Respondent to represent Mr. Sasser in his capacity as special administrator in the Orphans' Court. At this point, Respondent represented Mr. Hutchens, who was a legatee under the 2008 will, Mr. Watson, who was a legatee under both of Mr. Jefferies's wills, and the Estate for purposes of the caveat proceeding.

On March 27, 2014 during a status hearing for the caveat matter, Mr. Sasser learned that Mr. Watson had been collecting rent payments from the tenant in the Brandywine

---

[5] The law firm's trust account was in the name of Respondent's law partner.

property. Respondent failed to disclose that he had previously received $900.00 in rent money from Mr. Hutchens on June 21, 2012. At the disciplinary hearing in this matter, "Respondent testified that he did not believe it was on him to tell people what they had to do with property." On the same day as the status hearing in the Circuit Court, Respondent declared in a letter to Mr. Watson that he would need funds for litigation, and that he had already "loaned the estate '$2,000.00 for the Taxes paid in April 2013' and '$1,000.00 last month for our Expert.'" Respondent had not verified with Mr. Sasser that Respondent had advanced any personal funds to the Estate.

In December 2012, the Orphans' Court transferred the caveat matter to the Circuit Court for Prince George's County. At some point prior to March 2014, the Orphans' Court ordered Mr. Sasser to show cause why he should not be removed as special administrator. Respondent acting as Mr. Sasser's "undersigned counsel" filed a Line with Mr. Sasser's response. Respondent had only been retained to represent Mr. Sasser as the special administrator in the caveat matter, not to represent Mr. Sasser with respect to Mr. Jefferies's Estate pending in the Orphans' Court.[6] Shortly thereafter, the Orphans' Court removed Mr. Sasser as special administrator and appointed a successor Special Administrator, namely Nancy L. Miller, Esquire. Upon Mr. Sasser's removal as special

---

[6] Judge Snoddy found that "In filing the Line on behalf of [Mr.] Sasser, the Respondent acted outside the scope of the representation for which he was retained" because Respondent had only been retained to represent Mr. Sasser, as the special administrator, in the caveat matter. Notwithstanding this finding, Judge Snoddy did not conclude that Respondent's action in filing this Line violated Rule 1.2.

administrator, Respondent's representation of Mr. Sasser terminated. Respondent never provided Mr. Sasser with a bill for legal services.

Although neither Mr. Watson, nor Mr. Hutchens, had a personal interest in who served as special administrator of the Estate, Respondent appealed the Orphans' Court's Order that removed Mr. Sasser as special administrator. Judge Snoddy found that "[d]espite learning of [Mr.] Sasser's desire to no longer act as Special Administrator, the Respondent failed to withdraw his appeal" and that Respondent intended "to protect his own personal interests" in filing the appeal.

After Ms. Miller was appointed successor special administrator, Respondent remitted to her a check in the amount of $116.00, which was drawn on his law firm's attorney trust account. In a letter, Respondent informed Ms. Miller that he had received a $200.00 rent payment but used $84.00 to pay for the homeowner's insurance policy on the Brandywine property. He also explained that he exhausted the balance of cash listed on the Estate's Inventory Report for purposes of deposing Mr. Rankin, the scrivener for the two wills, for the caveat proceeding as well as paying real property taxes for 2012. In this same letter, Respondent claimed that the Estate owed him "$4,410.78 plus another $1,000.00 [that he] advanced personally for the Estate's Medical Expert, Anthony Wolff[.]" On May 5, 2014, three days after his letter to Ms. Miller, Respondent received an additional $400.00 of rent money from Mr. Watson, which he deposited into his law firm's attorney trust account. Yet, as of July 2014, when Ms. Miller filed the Inventory Summary, Respondent had failed to disclose his receipt of the rent money to her. Judge Snoddy found that Respondent "intentionally withheld from Miller: the $900.00 in rent

- 11 -

money he received from [Mr.] Hutchens in June 2013; the $400.00 in rent money he received from [Mr.] Watson on May 5, 2014; and the rent and expense receipts he obtained from [Mr.] Watson."

Ms. Miller made an initial plea in July 2014 for an accounting of the rent money collected. Respondent's reply letter to Ms. Miller offered a vague explanation for an accounting of funds: "Mr. Watson delivered rent to me when Mr. Sasser was exiting, and we knew Allstate needed to be paid so that's why the Escrow checks went to you, etc." Several months later in September 2014, Ms. Miller again urgently requested information on the whereabouts of more than $18,000.00 of rent money owed to the Estate. The letter reflects that the only money Respondent provided to Ms. Miller was the $116.00 that he remitted to her when she was appointed successor special administrator. By this point, Ms. Miller had been appointed Trustee and tasked with the responsibility of selling all of the properties, which were in jeopardy of being sold at tax sale. The hearing judge found that Respondent "intentionally withheld from [Ms.] Miller: the $900.00 in rent money he received from [Mr.] Hutchens in June 2013; the $400.00 in rent money he received from [Mr.] Watson on May 5, 2014; and the rent and expense receipts he obtained from [Mr.] Watson."

On October 31, 2014, all interested parties in the caveat suit engaged in settlement negotiations. By that point, Mr. Hutchens had renounced his bequest in the Estate proceeding and did not participate in the settlement discussions. In fact, "neither the Respondent nor anyone else mentioned [Mr.] Hutchens during the negotiations, advocated a position on his behalf, nor lodged an objection on his behalf to the agreement reached."

The parties reached an agreement, which included Mr. Watson receiving his specific bequest of land as well as Respondent receiving reimbursement for costs he personally advanced, and $5,000.00 from Mr. Watson for legal services. Nevertheless, as the terms of the settlement were placed on the record before the Circuit Court, Respondent

> for the very first time, and in contravention to the wishes of his client [Mr.] Watson, insisted that any agreement between the parties include a stipulation that [Ms.] Miller, as the court-appointed fiduciary of the estate, forgo pursuit of any legal action against [Mr.] Watson or [Mr.] Hutchens for any wrongdoing related to the dissipation of estate assets.

As a result of Respondent's action, the agreement dissolved. In carrying out the purported objections of one of his clients, Respondent's "potential conflict in representing both [Mr.] Hutchens and [Mr.] Watson manifested itself as an actual conflict at th[at] time."

After an unsuccessful settlement conference, Mr. Watson terminated Respondent's legal representation. Respondent failed to withdraw his appearance as counsel for Mr. Watson, indicated in a letter to Ms. Miller that withdrawing his appearance was "not something I'm going to get involved with so close to the trial date," and then filed a pleading as counsel for Mr. Watson in the Circuit Court.

*Respondent's Court Filings*

Respondent filed, purportedly on behalf of Mr. Hutchens, a pleading in the Orphans' Court to remove Ms. Miller as the special administrator. In the pleading, Respondent "falsely asserted that [Ms.] Miller had undertaken to represent [Mr.] Watson, as his attorney, in the estate proceedings."

In addition, on behalf of Mr. Hutchens, Respondent filed in the District Court of Maryland in Prince George's County suit against Mr. Sasser as "Personal Representative"

- 13 -

of the Estate of Mr. Jefferies. Mr. Sasser had been removed as special administrator nearly eight months prior to the filing of the suit. Moreover, Mr. Sasser was not the Personal Representative of Mr. Jefferies's Estate, a fact which Respondent knew. In addition, Respondent falsely claimed that the plaintiff, Mr. Hutchens, suffered $9,999.00 in damages, inclusive of "post-death Realty Taxes" and expert witness payments. According to Judge Snoddy, "[Mr.] Hutchens had no interest in those amounts, which were in fact payments the Respondent was seeking to recover for the benefit of himself and/or his law firm." Critically, Respondent "failed to notify [Mr.] Sasser of his intent to file the lawsuit nor did he request or obtain [Mr.] Sasser's consent, as a former client, to filing suit against him on behalf of another client (Hutchens)."

*Respondent's Efforts to Manipulate His Client*

Mr. Hutchens terminated Respondent's legal representation on January 29, 2015. Several days after doing so, Mr. Hutchens delivered to Respondent $1,200.00 in cash, which he had received from the tenant in the Brandywine property. Respondent deposited the funds into his law firm's attorney trust account and failed to notify Ms. Miller of his receipt of the funds. Despite the termination of representation, Respondent thereafter filed pleadings in Mr. Hutchens's name without authorization. Respondent failed to withdraw his appearance entered on behalf of Mr. Hutchens from either the Orphans' Court or the Circuit Court. On one occasion, Respondent appeared in Mr. Hutchens's driveway unannounced and asked Mr. Hutchens to sign a document that promised to settle the matter between them. On another occasion, Respondent sent a letter to Mr. Hutchens in which he stated that "Ms. Miller is planning to go after you following the February 17/18 Jury Trial

- 14 -

in the belief (which I've been sharing with you) that you 'stole' up to $350,000.00 of Freelove's money." He also referred to the receipt of the $1,200.00 cash and indicated to Mr. Hutchens that "those funds are 'being used to cover Litigation Expenses as well as reduce the Estate's debt to me for the Taxes I personally helped pay.'" The hearing judge found that Respondent's letter misrepresented the facts and that his actions were an "apparent effort to manipulate [Mr.] Hutchens to keep [Respondent] on as counsel[.]"

Eventually the parties settled the caveat matter without the involvement of Ms. Miller, Mr. Hutchens, or Respondent. Once the matter was remanded to the Orphans' Court, Respondent filed a pleading entitled "Petition for Section 7-603 'Litigation Expenses'." He attached a billing invoice that reflected a purported 235.24 hours, totaling over $80,000.00, of legal services performed for Mr. Sasser, Mr. Watson, and Mr. Hutchens. The billing invoice failed to indicate for which of the three clients the legal services were rendered. Additionally, Respondent never submitted to Ms. Miller verification of the personal funds that he allegedly advanced to the Estate.

*Respondent's Continued Court Filings and Efforts to Coerce Former Clients*

Ms. Miller filed a Third and Final Accounting with the Orphans' Court, which was approved by that court on February 24, 2016, subject to exceptions being filed. Had no exceptions been filed, Ms. Miller would have been permitted to make final disbursements twenty-one days after the Orphans' Court Order. Instead, Respondent filed exceptions to the final accounting because the account did not "contemplate disbursement to the Respondent for legal services rendered to the Estate." Although Respondent no longer represented Mr. Watson or Mr. Hutchens, he wrote to each of them and included in his

- 15 -

letter draft exceptions that reflected Respondent's "complicated recalculations of the disbursement." Judge Snoddy found that Respondent's letter was an attempt to "coerce [Messrs. Watson and Hutchens] into filing exceptions to [Ms.] Miller's final accounting." According to Respondent's recalculations, his law firm would receive a disbursement of $57,633.80.

Mr. Hutchens signed and returned the draft exceptions that Respondent had prepared. Mr. Hutchens did not rehire Respondent, or otherwise authorize Respondent to take action, for purposes of legal representation. Nevertheless, Respondent filed a revised copy of the exceptions, representing that he was Mr. Hutchens's counsel. The hearing judge explained that, "by Respondent's own testimony, he knew that [Mr.] Hutchens and [Mr.] Watson were not 'sophisticated.' Th[e] court f[ound] that [Mr.] Hutchens failed to comprehend the substance of the document he signed, and that based on [Mr.] Hutchens's testimony, he had no interest in excepting to [Ms.] Miller's final account."

Thereafter, on March 3, 2016, the Law Offices of McGill and Woolery filed suit in the Circuit Court for Prince George's County against Mr. Watson and Mr. Hutchens. The pleading, styled as a breach of contract, claimed damages in the amount of $75,000.00 and sought to hold Mr. Watson and Mr. Hutchens jointly and severally liable. Respondent never sent Mr. Watson or Mr. Hutchens periodic billing statements or sought payment from them throughout the representation.[7] The hearing judge found that the "Billing Ledger"

---

[7] Mr. Hutchens had initially paid Respondent $2,500.00 at the inception of Respondent's representation, but the hearing judge found that Respondent did not "seek payment of legal fees from either of them individually beyond what [Mr.] Hutchens paid in the early stages of the representation."

that Respondent filed with the Orphans' Court and that formed the basis for his claim of $75,000.00 of legal fees was "a highly inflated after-the-fact compilation of the Respondent's total time representing three different clients (including [Mr.] Sasser) with a multitude of differing interests in the Jefferies Estate." Additionally, Judge Snoddy found that much of the time billed reflected "Respondent's unilateral efforts to exercise control over the Estate in derogation of the Orphans' Court's orders appointing first [Mr.] Sasser and then [Ms.] Miller as special administrators charged with administering the Estate pending the outcome of the caveat litigation."

Separate from the breach of contract lawsuit, Respondent filed in the Circuit Court a "Request for an Order Directing the Issuance of a Writ of Attachment" with an attachment titled, "Exceptions to 'Account' By Litigation Counsel." Judge Snoddy found that the "'Exceptions' document represented yet another attempt by the Respondent's law firm to have the Orphans' Court award its claim for attorney's fees and expenses." Although the Circuit Court initially granted Respondent's writ of attachment, following oppositions by the parties and a hearing, the Circuit Court, *inter alia*, vacated the writ of attachment. The Circuit Court also declined to assume full jurisdiction over the Jefferies Estate. Respondent filed a Notice for In Banc Review of the Circuit Court's Order. A three-judge panel affirmed the Circuit Court's vacatur of the writ of attachment.

Meanwhile, in the breach of contract suit, Respondent filed a Motion for Summary Judgment as to Mr. Watson on December 16, 2016. Thereafter, he filed a Line for a Hearing on the Motion for Summary Judgment. Mr. Watson, through counsel, filed an opposition to the summary judgment motion. Although the Motion for Summary Judgment

had not been ruled on, the case was closed for inactivity. On October 11, 2017, Mr. Watson suffered a fatal stroke. According to the findings of the hearing judge, Respondent

> believed a legal claim against [Mr.] Watson's estate probably was time-barred as of [] the date the Respondent was testifying. Remarkably, he also testified that but for missing the opportunity to do so legally, he would be pursuing a claim against [Mr.] Watson's estate for the legal fees claimed in the Circuit Court action.

Following unsuccessful In Banc review in the Circuit Court, Respondent again sought to hinder distributions from the Jefferies Estate by filing a "Petition for Writ of Certiorari to the Orphans' Court for Prince George's County" on July 20, 2016. Judge Snoddy found that "Respondent filed this petition because he felt his claim for litigation counsel fees and expenses in connection with the Jefferies Estate had been wrongfully denied, and he was determined to obstruct final distributions from taking place." The Circuit Court eventually denied the petition for certiorari on May 18, 2017; however, the pendency of the petition prevented Ms. Miller from making any distributions of Mr. Jefferies's Estate. Importantly, the hearing judge noted that "Respondent's filing of the Petition for Writ of Certiorari had the effect of delaying final distributions, to the detriment of the Respondent's former client [Mr.] Watson, who would unfortunately pass away before receiving his distribution."

Respondent continued his attempts to block the distributions from Mr. Jefferies's Estate by filing two additional pleadings. On May 26, 2017, upon denial of the petition for certiorari, Respondent filed a Motion for Alteration or Amendment of the Judgment of the Circuit Court. Thereafter, Respondent sought review in this Court by filing a Petition for Writ of Certiorari on July 27, 2017. This Court denied his petition on September 22, 2017.

- 18 -

*Attorney Trust Account*

Finally, Judge Snoddy found that on several occasions Respondent deposited into his law firm's attorney trust account rent money that he had received from either Mr. Hutchens or Mr. Watson. For example, on or about June 21, 2013, Mr. Hutchens gave Respondent $900.00 of rent money, which Respondent deposited into the McGill attorney trust account without notifying Mr. Sasser of the existence of the funds. On May 5, 2014, Mr. Watson delivered to Respondent $400.00 in rent money, the sum of which was deposited into the law firm's attorney trust account. On February 4, 2015, Mr. Hutchens delivered $1,200.00 of rent money to Respondent. These funds were also deposited into the McGill attorney trust account. Respondent did not notify Ms. Miller that he had received two rent payments in the amount of $400.00 and $1,200.00. The hearing judge found that Respondent "withdrew from the escrow account some of the rent money for his personal use and benefit." A check in the amount of $1,012.69, made payable to Respondent, was drawn from the McGill attorney trust account on February 13, 2015. The deposit slip noted that the amount of $1,012.69 was the "balance of '[Mr.] Hutchens's escrow [and] helps reduce [the] Estate's debt to me." To be sure, Respondent testified at the disciplinary hearing that "he reimbursed himself for funds he had personally advanced to the estate and was still owed, in February 2015, 'about three grand.'"

## DICUSSION

### *Standard of Review*

We review a hearing judge's findings of fact for clear error and his or her conclusions of law *de novo*. *Attorney Grievance Comm'n v. Blair*, 440 Md. 387, 400-01,

102 A.3d 786, 793 (2014). As far as what evidence a hearing judge must rely upon to reach his or her conclusions, we have said that the hearing judge "may 'pick and choose' what evidence to believe." *Attorney Grievance Comm'n v. Page*, 430 Md. 602, 627, 62 A.3d 163, 178 (2013). We reiterate this point in light of Respondent's numerous exceptions to findings of facts in which he suggests that the hearing court *should have made* certain findings of fact. Accordingly, we will not disturb the hearing judge's findings of fact unless they are clearly erroneous. *Blair*, 440 Md. at 400, 102 A.3d at 793. We overrule Respondent's generalized exceptions as to what findings of fact the hearing court failed to make. Bar Counsel does not except to any of Judge Snoddy's findings of fact.

### *Respondent's Exceptions to Findings of Fact*

With respect to the hearing judge's finding that Respondent's notice to Mr. Sasser of the existence of an estate bank account within two months of Mr. Sasser's appointment as Special Administrator was not *prompt*, Respondent filed an exception. Arguably, whether Respondent's notice was *prompt* is a matter of subjective calculation given the circumstances. *See, e.g.*, *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 663, 698 A.2d 1167, 1195 (1997) ("[T]imeliness of notice is an elusive concept as it is variously defined as 'as soon as practicable,' 'within a reasonable time under all the circumstances,' 'not an iron-bound requirement that it be immediate or even prompt,' and 'within a reasonable time in light of the facts and circumstances of the case at hand.'"). Notwithstanding, we overrule Respondent's exception to the fact that he sent a letter to Mr. Sasser on or about July 10, 2012 alerting Mr. Sasser as to the caveat litigation but failed, at that time, to mention the existence of the Estate's assets. In other words, when

- 20 -

Respondent had an opportunity to promptly notify Mr. Sasser about the Estate bank account, he delayed doing so by approximately one month.[8]

### Conclusions of Law
### &
### Respondent's Exceptions to Conclusions of Law

Bar Counsel does not except to any of the hearing judge's conclusions of law. Respondent excepts to all of the conclusions of law. For his part, Judge Snoddy reached detailed conclusions of law, by clear and convincing evidence, with respect to Mr. Woolery's violations of the MLRPC and MARPC based on evidence presented at the evidentiary hearing.

### MARPC 19-301.1 Competence (1.1)[9]

MARPC 19-301.1 Competence (1.1) provides: "An attorney shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

---

[8] Respondent also excepts to the hearing court's finding that he misled the attorney who represented the tax sale purchaser. Respondent asserts that it was not misleading to indicate to this attorney that Respondent had paid the taxes. We overrule Respondent's exception because Respondent mischaracterizes the hearing judge's finding. To be clear, Judge Snoddy found that "at the time the Respondent wrote to [counsel], [Respondent] did not represent the special administrator nor was he otherwise counsel for the Estate of Freelove Jefferies."

[9] Because Respondent's alleged misconduct occurred both before *and* after July 1, 2016, he was charged with violating the MLRPC and the MARPC. To minimize confusion, we refer to the rules as they are currently codified as MARPC.

Once Respondent chose to "insert himself into the estate administration process as counsel for [Mr.] Hutchens, [he] was obligated to do so competently." Among other acts violative of Rule 1.1, the hearing judge found that Respondent acted inappropriately. He

> usurped the fiduciary responsibilities assigned to [Mr.] Sasser and failed to disclose material information in his possession about estate assets to [Mr.] Sasser . . . By withholding information from [Mr.] Sasser, the Respondent hampered [Mr.] Sasser's ability to carry out his fiduciary accounting requirements as special administrator . . . Perhaps most egregiously, the Respondent misappropriated[10] estate funds when, on multiple occasions, he deposited cash rent payments received from [Mr.] Hutchens and [Mr.] Watson into his firm's attorney trust account.

The hearing judge appropriately observed that "[a]lthough he was not officially charged with the responsibility of administering the Jefferies Estate, the Respondent effectively chose to take on such a role without authorization through his actions." Judge Snoddy concluded that Respondent failed to provide competent representation to each of the three clients: Mr. Watson, Mr. Hutchens, and Mr. Sasser.

Respondent excepts to the conclusion that he did not competently represent his three clients in violation of Rule 1.1. He argues that he did not lose the caveat litigation, that Mr. Watson received his real estate parcel, and that the Estate's property was not lost to

---

[10] *See* §§ 7-601 to 602 of the Estates and Trusts Article (providing for reasonable compensation for services of an attorney which "shall be fair and reasonable in the light of all the circumstances to be considered in fixing the fee of an attorney."). Respondent's actions with respect to the Estate's funds include depositing money in to Mr. Jefferies's savings account, collecting the rent payments when he was not authorized to do so, withdrawing unauthorized disbursements from his law firm's attorney trust account, holding and failing to disclose money held in trust, failing to give a full accounting of the Estate's money that he held in trust, and as of the filing of this Opinion, continuing to hold money that belongs to the Estate.

tax sale.  Because we do not measure an attorney's violation of the Rules of Professional Conduct based on success, or failure to succeed, we overrule Respondent's exception.

*MARPC 19-301.2 Scope of Representation and Allocation of Authority Between Client*

*and Attorney (1.2)*

MARPC 19-301.2 Scope of Representation and Allocation of Authority Between Client and Attorney (1.2) provides, in pertinent part:

> [A]n attorney shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued.  An attorney may take such action on behalf of the client as is impliedly authorized to carry out the representation.  An attorney shall abide by a client's decision whether to settle a matter.

The hearing judge found that instead of settling the caveat matter on October 31, 2014 according to the wishes of Mr. Watson, Respondent "torpedoed the deal by raising an issue involving another client–[Mr.] Hutchens–after the parties seemingly had agreed to resolve the matter."  Thus, Respondent violated the Rule pertaining to scope of representation and allocation of authority between client and lawyer when he failed to abide by his client's decision to settle the matter.

Respondent excepts to the hearing judge's conclusion of law that he violated Rule 1.2 for the same reasons that he excepts to the conclusion that he violated Rule 1.1.  We overrule Respondent's exception because Rule 1.2 charges an attorney with the directive to "abide by a client's decisions concerning the objectives of the representation[.]" MARPC 19-301.2; s*ee also Attorney Grievance Comm'n v. Sperling*, 432 Md. 471, 493, 69 A.3d 478, 490-91 (2013) (explaining that it was the client's choice that "was offended

- 23 -

by [the attorney's] failure to inform her of the dismissal."). Respondent failed to abide by Mr. Watson's directive when Respondent caused the breakdown of settlement negotiations due to Respondent's concern for another of his clients, Mr. Hutchens.

*MARPC 19-301.4 Communication (1.4)*

MARPC 19-301.4 Communication (1.4) provides:

> (a) An attorney shall:
> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;
> (2) keep the client reasonably informed about the status of the matter;
> (3) promptly comply with reasonable requests for information; and
> (4) consult with the client about any relevant limitation on the attorney's conduct when the attorney knows that the client expects assistance not permitted by the Maryland Attorneys' Rules of Professional Conduct or other law.
>
> (b) An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Judge Snoddy found that Respondent "took advantage of what he perceived to be [Mr.] Hutchens and [Mr.] Watson's overall lack of sophistication in order to pursue what evolved into a personal agenda of maximizing his attorney's fees." Respondent not only failed to reasonably explain what actions he was taking throughout the litigation, but he also failed to "consult with [Mr. Watson and Mr. Hutchens] in any meaningful way about his strategy." Because he did not meaningfully engage either Mr. Watson or Mr. Hutchens in discussions about strategy, much less the goals of representation, neither client was able to make an informed decision as required by Rule 1.4. Moreover, Respondent concealed information from his client, Mr. Sasser, that Mr. Sasser would need to carry out his fiduciary role. Specifically, Respondent failed to inform Mr. Sasser about the tenant in the

- 24 -

Brandywine house, the fact that the tenant was paying rent, and that Respondent had received rent payments from Mr. Hutchens and Mr. Watson who collected them from the tenant. The hearing judge concluded that Respondent violated Rule 1.4 with respect to all three of his clients.

Respondent excepts to the conclusion that he violated Rule 1.4 on the basis that the evidence does not support the hearing judge's conclusion that "Mr. Woolery engaged in protracted litigation because of 'a personal agenda of maximizing his attorney's fees[.]'" Yet, tellingly, Respondent also admits that "[h]is imaginative and protracted litigation seeking payment was a serious error in judgment on his part." Notwithstanding his own admission, whether Respondent's personal agenda, or the absence of one, influenced his representation of Mr. Hutchens or Mr. Watson does not excuse his conduct with respect to Mr. Sasser. Respondent failed to inform Mr. Sasser of important facts that affected Mr. Sasser's compliance with his duties as special administrator of Mr. Jefferies's Estate. We overrule Respondent's exception.

*MARPC 19-301.5 Fees (1.5)*

MARPC 19-301.5 Fees (1.5) provides, in part:

 (a) An attorney shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the attorney;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the attorney or attorneys performing the services; and

(8) whether the fee is fixed or contingent.

The hearing judge reached the conclusion that Respondent violated Rule 1.5 with respect to Mr. Watson and Mr. Hutchens when he sought to recover $75,000.00 in fees. Respondent never sent either client a billing statement throughout the period of representation. The "Billing Ledger" that was submitted as part of Respondent's breach of contract suit against Mr. Watson and Mr. Hutchens had never been provided to either of them, did not identify which services were provided for whom, and contained entries for a three-year period, a period which extended beyond Respondent's representation of Mr. Watson. Despite representing Mr. Watson for a period of just over a year, from September 2013 through November 2014, "Respondent sought to charge [Mr.] Watson for services rendered to his other clients ([Mr.] Hutchens and [Mr.] Sasser) both before, during, and after his representation of [Mr.] Watson and for 'legal services' unrelated to his representation of any of his clients."[11] The hearing judge concluded that when Respondent's efforts to collect legal fees either through his Petition for Section 7-603 Litigation Expenses or through a disbursement from the Third and Final Accounting were

---

[11] The hearing judge explained that Respondent's intention was to recover fees from Mr. Watson for legal services unrelated to his representation of any of his clients and that this was

> borne out in [Respondent's] threatening letter to [Mr.] Watson of March 4, 2016, wherein he advised that "in a worst-case scenario we've asked the Circuit Court to award all of your $43,923.03 'net distribution' to us if we are unable to have the Orphans' Court award some of our Fees against Ms. Deidre Jefferies and Ms. Baylor."

unsuccessful, he pivoted his "efforts to charge and collect unreasonable legal fees from [Mr.] Hutchens and [Mr.] Watson."

Respondent excepts to the conclusion that he violated Rule 1.5, despite conceding that "his efforts to be paid were unnecessarily aggressive and had the effect of delaying the ultimate disbursement of the estate funds." He insists that he did the legal work and suggests that a sanction of suspension from the practice of law not to exceed 30 days is appropriate for his "serious error in judgment." We overrule Respondent's exception because an attorney may violate Rule 1.5(a) when he fails to provide his client invoices. *See Attorney Grievance Comm'n v. Rand*, 445 Md. 581, 608, 128 A.3d 107, 124 (2015) (concluding that the attorney violated Rule 1.5 when he failed to provide his client with invoices for services and noting that client made repeated requests for invoices). Moreover, it is a plain violation of the Rule for an attorney to collect fees for services he did not render to that client.

*MARPC 19-301.7 Conflict of Interest (1.7)*

MARPC 19-301.7 Conflict of Interest (1.7) provides:

(a) Except as provided in section (b) of this Rule, an attorney shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if:
(1) the representation of one client will be directly adverse to another client; or
(2) there is a significant risk that the representation of one or more clients will be materially limited by the attorney's responsibilities to another client, a former client or a third person or by a personal interest of the attorney.
(b) Notwithstanding the existence of a conflict of interest under section (a) of this Rule, an attorney may represent a client if:
(1) the attorney reasonably believes that the attorney will be able to provide competent and diligent representation to each affected client;
(2) the representation is not prohibited by law;

- 27 -

(3) the representation does not involve the assertion of a claim by one client against another client represented by the attorney in the same litigation or other proceeding before a tribunal; and
(4) each affected client gives informed consent, confirmed in writing.

Respondent's dual representation of Mr. Hutchens and Mr. Watson "was fraught with the potential for a conflict of interest from the outset," even in spite of the fact that Mr. Hutchens renounced his right to any claim under the 2008 will and, in fact, desired for Mr. Watson to receive his bequest. The hearing judge concluded that although there already was a "significant risk" that Respondent's representation of Mr. Hutchens could be "materially limited" by his representation of Mr. Watson, and vice versa, the potential conflict actually materialized. On October 31, 2014, the day of settlement negotiations with Ms. Miller, "Respondent acted in a manner directly contrary to the wishes of [Mr.] Watson by blocking the settlement deal agreed to by all parties[.]" Additionally, Respondent's efforts to prevent the distribution of the Estate "served to prevent [Mr.] Watson from receiving his distribution before his death." These actions exemplify Respondent's conflict of interest in his representation of Mr. Watson.

With respect to Mr. Sasser, the hearing judge keenly noted that "[c]oncomitant with the rule against conflicts of interest is the duty of loyalty." As Judge Snoddy explained, "[a]s attorney for [Mr.] Hutchens, the designated defendant in the caveat case, the Respondent (and [Mr.] Sasser too for that matter) should have recognized the impropriety of the Respondent also representing the special administrator in any capacity or, for that matter, the special administrator having any active involvement in the litigation."

Respondent also violated Rule 1.7 when he failed to inform Mr. Sasser of the existence of, and his receipt of, Estate funds.

Respondent insists that the interests of two of his clients did not conflict with Mr. Sasser's interests; thus, he excepts to the hearing judge's finding and conclusion of law that he had a conflict of interest with respect to his three clients. Respondent, on the one hand, contends that "Mr. Hutchens and Mr. Watson wanted the exact same thing . . . Mr. Sasser's position was not adverse to that goal." On the other hand, he deflects any responsibility for the conflict because "[t]he Circuit Court declined to remove Mr. Woolery as counsel and thus Mr. Woolery was duty bound to prepare for the jury trial in the caveat litigation." Contrary to Respondent's assertion, the hearing judge found that "[o]utside of the courtroom *prior to* the start of the hearing, the Respondent approached [Mr.] Watson with the idea of presenting a 'unified front at trial.'" (Emphasis added). Importantly, MARPC 19-301.7(a)(2) contemplates a conflict of interest when "there is a significant risk" that the attorney will be handicapped in his representation of one client because of the attorney's duties to another client. Respondent sought out the representation of Mr. Watson without consideration of the potential of a significant risk that representation of Mr. Hutchens would materially limit his ability to represent Mr. Watson. The hearing judge found that the potential conflict "manifested itself as an actual conflict." We see no error in Judge Snoddy's conclusion.

*MARPC 19-301.9 Duties to Former Client (1.9)*

MARPC 19-301.9 Duties to Former Client (1.9) provides, in pertinent part:

(a) An attorney who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Nearly eight months after Mr. Sasser had been removed as special administrator from Mr. Jefferies's Estate, Respondent filed suit against him as "Personal Representative" on behalf of Mr. Hutchens. This pleading, filed in the District Court for Prince George's County, claimed damages of $9,999.00. Respondent's suit against Mr. Sasser violated Rule 1.9 because "Respondent's personal interests in the District Court action were materially adverse to the interests of his former client, [Mr.] Sasser." In violation of the Rule, the lawsuit was "the same or a substantially related matter" to Respondent's previous representation of Mr. Sasser. MARPC 19-301.9. Respondent did not obtain Mr. Sasser's consent, confirmed in writing, prior to filing the suit.

Respondent objects to the finding that the lawsuit filed against Mr. Sasser was a conflict and objects to the conclusion that he violated Rule 19-301.9 as a result. He asserts that the suit was filed "strictly as a place holder to put all parties on notice that certain litigation expenses needed to be reimbursed." We overrule Respondent's exceptions because Rule 1.9 does not carve out any exceptions for suits filed as "place holders." Furthermore, we have previously rejected the use of any type of coercive tactic for purposes of securing damages. *See Attorney Grievance Comm'n v. Gisriel*, 409 Md. 331, 356-57,

974 A.2d 331, 346 (2009) ("The legal process should never be used as . . . merely a device to apply pressure to the other parties[.]").[12]

*MARPC 19-301.15 Safekeeping Property (1.15)*

MARPC 19-301.15 Safekeeping Property (1.15) provides, in part:

(a) An attorney shall hold property of clients or third persons that is in an attorney's possession in connection with a representation separate from the attorney's own property.  Funds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years after the date the record was created.

\* \* \*

(d) Upon receiving funds or other property in which a client or third person has an interest, an attorney shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, an attorney shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

Respondent violated Rule 1.15 in several ways.  Respondent caused the amounts of $900.00, $400.00, and $1,200.00 to be deposited into his law firm's attorney trust account, knowing that those funds represented rental income from the Brandywine property and were assets of Mr. Jefferies's Estate.  Respondent did not notify the appropriate fiduciary of his receipt of estate funds.  Additionally, he failed to safeguard the funds when he

---

[12] In *Gisriel*, the attorney was not charged with a violation of Rule 1.9 but was charged with violating Rule 3.1 because he sued individuals even though he had no basis for asserting damages against those individuals and his suit was an attempt "to get everyone's 'attention.'" *Attorney Grievance Comm'n v. Gisriel*, 409 Md. 331, 356, 974 A.2d 331, 345 (2009).

disbursed the funds for purposes of litigation expenses related to the caveat proceeding or for reimbursement of fees he claimed he had personally advanced to the Estate without prior approval. *See Attorney Grievance Comm'n v. Owrutsky*, 322 Md. 334, 344, 587 A.2d 511, 516 (1991); *see also* Estates and Trust Article, §§ 7-601 to 602. Finally, Respondent failed to comply with the Rule when he declined to promptly render a full accounting regarding the funds, upon request by Ms. Miller.

Respondent excepts to the hearing court's finding that he misappropriated $900.00 of rent money, and, as a result, that he violated Rule 1.15. At the outset, we note that Respondent does not dispute the finding of fact that he collected $900.00 of rent money from Mr. Hutchens and never turned it over to Mr. Sasser. Instead, Respondent reasons that misappropriation did not occur because the funds he received from Mr. Hutchens or Mr. Watson were never deposited into his law firm's operating account. Respondent deposited the funds into the attorney's trust account. Additionally, Respondent argues that he was entitled to reimbursement pursuant to Estates & Trusts Art., § 7-603.[13]

We have previously defined misappropriation as "any unauthorized use by an attorney of a client's funds entrusted to him or her, whether or not temporary or for personal gain or benefit." *Attorney Grievance Comm'n v. Jones*, 428 Md. 457, 468, 52 A.3d 76, 82 (2012) (quoting *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 484, 671 A.2d 463,

---

[13] Section 7-603 of the Estates and Trusts Article, Md. Code Ann., provides, "When a personal representative or person nominated as personal representative defends or prosecutes a proceeding in good faith and with just cause, he shall be entitled to receive his necessary expenses and disbursements from the estate regardless of the outcome of the proceeding."

- 32 -

481 (1996)). In *Jones*, the hearing court found that Mr. Jones withdrew from his attorney trust account more funds for his own benefit than he had earned as fees and that this act violated Rule 1.15. 428 Md. at 466, 52 A.3d at 81.

In *Owrutsky*, we were asked to consider whether an attorney, acting as a personal representative and trustee in separate estate cases, violated the Rules of Professional Conduct when the attorney took estate funds without the approval of the Orphans' Court and without accounting for the funds, even though those same funds were later approved by the Orphans' Court. 322 Md. at 344, 587 A.2d at 516. We opined that:

> [Estate] funds . . . are those of the estate, and not those of the attorney. The attorney has no right to those funds, either as a commission or as an attorney's fee, unless and until and approval pursuant to § 7-601 or § 7-602 of the Estates and Trusts Article, Maryland Code (1974, 1990 Cum. Supp.) has been obtained from the Orphans' Court.

*Id.* The obvious difference between *Owrutsky* and the present case–that Respondent was neither a personal representative nor a trustee in Mr. Jefferies's estate–is of no consequence. We heed the observation made in *Owrutsky* as well as the definition of misappropriation described in *Jones* and conclude that an attorney misappropriates funds when he collects and retains funds that he is not authorized to collect or retain and then, without authorization, disburses those funds to himself for reimbursement purposes.

Here, Respondent, by his own admission, explained that he reimbursed himself for "monies I advanced to the Estate out of my own personal pocket because the circumstances left us with little choice." At no point did Respondent have the authority to collect, or disburse, the Estate's assets. In the absence of a personal representative, the special administrator is charged with "any unperformed duties required of a personal

- 33 -

representative . . . [and] shall *collect*, *manage*, and *preserve* property of the estate[.]" *See* Md. Rule 6-454 (emphasis added); *see also* Md. Code, Estates & Trusts Art., § 6-401 ("(a) Upon the filing of a petition . . . a special administrator may be appointed by the court whenever it is necessary to protect property prior to the appointment and qualification of a personal representative[.]"). Critically, Respondent collected the $900.00 of rent from Mr. Hutchens on June 21, 2012, one week *after* Mr. Sasser was appointed special administrator on June 14, 2012. We overrule Respondent's exceptions.

*MARPC 19-301.16 Declining or Terminating Representation (1.16)*

MARPC 19-301.16 Declining or Terminating Representation (1.16) provides, in part:

> (a) Except as stated in section (c) of this Rule, an attorney shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:
> (1) the representation will result in violation of the Maryland Attorneys' Rules of Professional Conduct or other law;
> (2) the attorney's physical or mental condition materially impairs the attorney's ability to represent the client; or
> (3) the attorney is discharged.
> *           *           *
> (d) Upon termination of representation, an attorney shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of another attorney, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The attorney may retain papers relating to the client to the extent permitted by other law.

Respondent violated Rule 1.16 when he purported to continue his representation of Mr. Watson and Mr. Hutchens despite the clients' termination of representation. After Mr. Hutchens terminated representation, Respondent filed pleadings in the Circuit Court and

- 34 -

Orphans' Court without Mr. Hutchens's authorization. Additionally, Respondent filed a line with the Circuit Court wherein he represented that he was Mr. Watson's counsel, despite Mr. Watson terminating representation nearly one month before that filing.

Respondent excepts to the conclusion that he violated Rule 1.16. He asserts that he requested to withdraw from the cases "at the earliest opportunity" after Mr. Hutchens and Mr. Watson requested termination of representation. Testimonial and documentary evidence indicates that Respondent's representation of Mr. Watson was terminated in November 2014 and representation of Mr. Hutchens was terminated in January 2015. Respondent, however, did not file a motion to withdraw. An attorney's failure to withdraw "in a timely fashion" violates Rule 1.16. *Attorney Grievance Comm'n v. Steinberg*, 395 Md. 337, 365, 910 A.2d 429, 445 (2006). We, therefore, overrule Respondent's exception.

*MARPC 19-303.1 Meritorious Claims and Contentions (3.1)*

MARPC 19-303.1 Meritorious Claims and Contentions (3.1) provides:

An attorney shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes, for example, a good faith argument for an extension, modification or reversal of existing law. An attorney may nevertheless so defend the proceeding as to require that every element of the moving party's case be established.

The hearing judge concluded

Respondent violated this rule through his persistent course of filing motions to remove Nancy Miller as special administrator and trustee, exceptions to her accounts and notices of appeal, all with the purpose of delaying the distribution of the Jefferies Estate because the Respondent felt his claim of attorney's fees and expenses as so-called "Litigation Counsel" had not been properly considered in negotiating a resolution.

Respondent's non-meritorious filings continued even after his clients' interest in the matter were non-viable. The hearing judge determined that Respondent filed seven additional frivolous pleadings after the Circuit Court dismissed the "caveat as moot by its Order dated February 18, 2015."[14] Judge Snoddy stopped short of declaring Respondent's breach of contract action in the Circuit Court against his former clients, Mr. Watson and Mr. Hutchens, *per se* frivolous, but nevertheless concluded that Respondent's "use [of] that civil action as a vehicle to have the Circuit Court 'assume full jurisdiction' over the Jefferies Estate was a non-meritorious claim or contention within the context of that case."

Respondent filed two pleadings after July 1, 2016, when the MLRPC were changed to MARPC. Judge Snoddy reviewed both of those pleadings and concluded that the petition for certiorari in the Circuit Court was "a wholly frivolous filing" containing arguments that were "smokescreens used as a mechanism to harass the Orphans' Court because of the Respondent's personal dissatisfaction with that Court's decisions in the

---

[14] Specifically, the hearing judge found that Respondent frivolously filed the following pleadings:

> (1) Mr. Hutchens's Petition for Reconsideration of the March 10, 2015, Order, filed April 9, 2015, more than two months after [Mr.] Hutchens fired him;
> (2) Exceptions to "Account" By Litigation Counsel, filed March 3, 2016;
> (3) Litigation Counsel's Amended Exception to the "Final Account," filed March 10, 2016;
> (4) Exception of Ronald Hutchens to the "Final Account," filed March 24, 2016;
> (5) Notice of Appeal to Circuit Court by Mr. Ronald Hutchens, filed March 24, 2016;
> (6) Notice of Appeal to Circuit Court by McGill & Woolery, filed March 24, 2016; and
> (7) Notice of Appeal to Circuit Court, filed April 28, 2016.

Jefferies Estate." For the same reasons, Judge Snoddy concluded that the petition for certiorari filed in this Court was also an abuse of judicial process in violation of Rule 3.1.

Respondent partially excepts to the conclusion that he violated Rule 3.1 for the same reason he objected to a violation of Rule 1.5. Respondent asserts that he "performed extensive legal services for his clients." Providing extensive legal services, however, does not justify pursuing legal action "in an effort to extract legal fees by any means." *Attorney Grievance Comm'n v. Powers*, 454 Md. 79, 105, 164 A.3d 138, 153 (2017) (holding that Respondent violated Rule 3.1 when he sued his former client and third party in a court that lacked jurisdiction "merely in an effort to extract legal fees by any means."). We overrule Respondent's exception.

*MARPC 19303.3 Candor Toward the Tribunal (3.3)*

MARPC 19-303.3 Candor Toward the Tribunal (3.3) provides in pertinent part, "(a) An attorney shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the attorney[.]"

Prompted by his "personal animus against [Ms.] Miller following the October 31, 2014, settlement hearing and by [Mr.] Watson's recent termination of his representation[,]" Respondent falsely asserted in a motion to remove Ms. Miller as trustee, which he supported with an affidavit signed by Mr. Hutchens, that Ms. Miller had undertaken representation of Mr. Watson.[15] In contrast, Ms. Miller testified that she never represented

---

[15] Respondent's motion to remove Ms. Miller as trustee stated, in pertinent part, "Movant [Mr. Hutchens] came to learn from Mr. Watson after the October 31st proceedings that Mr.

- 37 -

Mr. Watson and that he never signed a retainer agreement with her. Furthermore, she testified that Mr. Watson did not give her $1.00 in exchange for her representation, nor did he make a call from her office to Mr. Hutchens in front of her. The hearing judge found that Respondent "knew he had no basis in fact to believe [that Ms. Miller had represented Mr. Watson]" when Respondent raised the issue with the court. On this matter, Judge Snoddy was free to credit Ms. Miller's testimony as to whether she represented Mr. Watson. Additionally, Respondent violated Rule 3.3 when he claimed damages on behalf of Mr. Hutchens in his suit against Mr. Sasser filed in the District Court.[16] As Mr. Hutchens had no claim to those amounts, "Respondent was seeking to recover those payments solely for the benefit of himself and/or his law firm."

Respondent excepts to the conclusion that he violated this Rule because he asserts that Bar Counsel did not prove that he knew the affidavit supplied to him by Mr. Hutchens was false. In arguing this exception, Respondent offers an explanation that is, itself, contradictory: "It was not an affidavit supplied by Mr. Hutchens -- it was not Mr. Woolery's affidavit." We overrule Respondent's exception because there was clear and

---

Watson was receiving advice from Ms. Miller independently from that of Mr. Woolery as Mr. Watson's counsel of record herein - Mr. Hutchens' affidavit attached hereto speaks for itself." Mr. Hutchens's affidavit, attached to the motion, stated, "In William's calls, he once told me he was at Ms. Miller's office, and he informed me that he was firing Mr. Woolery and hired Ms. Miller 'with one dollar' (he told me he fired Mr. Woolery after he hired Ms. Miller and he 'knew her a long time' from something in his family[.])"

[16] Among other expenses Respondent sought on behalf of Mr. Hutchens in the District Court filing were "'post-death Realty Taxes advanced' of approximately $3,500.00 and an advanced expert witness payment of $1,000.00)."

convincing evidence before Judge Snoddy that Respondent had no basis to believe that Ms. Miller represented Mr. Watson when he asserted those facts in the motion to remove Ms. Miller as Trustee. Respondent also excepts on the basis that the expenses he sought to recover from the suit filed against Mr. Sasser "were real – they were actually incurred." In overruling this exception, we reiterate our conclusion with respect to Respondent's violations of Rule 1.5 regarding fees. Respondent at no point provided his client a billing invoice for legal services.

*MARPC 19-307.3 Direct Contact with Prospective Clients (7.3)*

MARPC 19-307.3 Direct Contact with Prospective Clients (7.3) provides in part:

(a) An attorney shall not by in-person, live telephone or real-time electronic contact solicit professional employment from a prospective client when a significant motive for the attorney's doing so is the attorney's pecuniary gain, unless the person contacted:
(1) is an attorney; or
(2) has a family, close personal, or prior professional relationship with the attorney.

Respondent solicited Mr. Watson as a prospective client in June 2013 just before the start of a hearing in the Orphans' Court. At that time, Respondent offered Mr. Watson a retainer agreement to sign, which Mr. Watson later signed. Respondent formalized the attorney-client relationship when he signed the agreement on September 9, 2013. Although he indicated to Mr. Watson that his intention was to present a "unified front," the Respondent was primarily motivated by a pecuniary gain in violation of Rule 7.3. Representing Mr. Watson, who was a legatee under the wills, secured Respondent another client, and thus an opportunity to attempt to recover fees for his services in the Estate matter. The hearing judge observed that Respondent's motive "was borne out in the

Respondent's attempt to take all of Watson's contemplated disbursement, which totaled over $43,000.00, through the breach of contract lawsuit."

Respondent excepts to the conclusion that he violated Rule 7.3 on the basis that an attorney does not violate the Rule when the prospective client has "a family, close personal, or prior professional relationship with the lawyer." Respondent suggests that Mr. Watson qualifies as a "person with a prior professional relationship" because Mr. Watson assisted Respondent and Mr. Hutchens in preparing the caveat case. In previous cases where an attorney is alleged to have violated Rule 7.3, we have acknowledged the distinction between an attorney's efforts to actively seek out clients as opposed to "a situation in which there was no expectation or obligation of representation at the outset." *Attorney Grievance Comm'n v. Merkle*, 440 Md. 609, 632, 103 A.3d 679, 693 (2014) (distinguishing cases where an attorney solicits clients approaching them after they have just left the courtroom from the case at hand where, *inter alia*, the attorney initially refused to represent the prospective client and the attorney, at no time, unduly influenced the client to retain him for legal representation). That Respondent in the case at bar may have formed a relationship—that of attorney and witness—in the context of preparing for litigation does not mitigate Respondent's other disingenuous actions in his attempt to represent Mr. Watson. Respondent approached Mr. Watson in the courthouse, had with him a prepared retainer agreement, and stated that he desired to present a "unified front at trial." Yet, when Respondent was unsuccessful at recovering his attorney's fees through various litigation and appellate mechanisms, he attempted to take Mr. Watson's contemplated disbursement as compensation.

*MARPC 19-308.4 Misconduct (8.4)*

MARPC 19-308.4 Misconduct (8.4) provides in relevant part:

It is professional misconduct for an attorney to:
(a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

\*　　　\*　　　\*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice[.]

Respondent violated Rule 8.4(c) when he violated Rule 3.3(a) by making false statements to a tribunal. Moreover, the entirety of Respondent's conduct was prejudicial to the administration of justice in violation of Rule 8.4(d). Judge Snoddy observed that Respondent "pursu[ed] a personal agenda motivated by his own financial interest . . . intentionally derailed the parties October 31, 2014 settlement agreement . . . and continued to delay the distribution of the estate for over one year." The Respondent's actions toward Mr. Watson and Mr. Hutchens post-representation, *i.e.* "falsely claiming that they owed him $75,000.00 in legal fees . . . and threaten[ing] to take [Mr.] Watson's entire distribution if he did not comply" brought the legal profession into disrepute. Finally, Respondent violated Rule 8.4(a) when he violated other Rules of Professional Conduct.

Respondent excepts to the conclusion that he violated Rule 8.4 and adopts the same explanation he provided for his exception to Rule 3.3(a). As we overruled his exception to Rule 3.3, we likewise overrule his generalized exception to Rule 8.4.

**SANCTION**

We turn now to the appropriate sanction for Respondent's violations of the MARPC. As mentioned, Respondent recommends that we sanction him with a thirty-day suspension. Bar Counsel, on the other hand, recommends a sanction of disbarment. The sanction we impose is intended to "protect the public and public's confidence in the legal profession." *Attorney Grievance Comm'n v. Moore*, 451 Md. 55, 88, 152 A.3d 639, 658 (2017). Sanctions protect the public when those sanctions are "commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Grievance Comm'n v. Powers*, 454 Md. 79, 107, 164 A.3d 138, 154 (2017). When deciding the proper sanction for an errant attorney's conduct, ". . . we do not simply tote up the number of possible violations and aggravating factors to arrive at an appropriate sanction." *Attorney Grievance Comm'n v. Ndi*, 459 Md. 42, 65, 184 A.3d 25, 38 (2018).

*Aggravating Factors*

We have oft cited Standard 9.22 of the American Bar Association Standards for Imposing Lawyers Sanctions to guide our consideration of aggravating factors, which include:

(a) prior disciplinary offenses;
(b) dishonest or selfish motive;
(c) a pattern of misconduct;
(d) multiple offenses;
(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of the victim;
(i) substantial experience in the practice of law;

(j) indifference to making restitution; and
(k) illegal conduct, including that involving the use of controlled substances.

*Attorney Grievance Comm'n v. Woolery*, 456 Md. 483, 500, n. 10, 175 A.3d 129, 139, n.

10 (2017) (citing American Bar Ass'n, *ABA 2017 Compendium of Professional*

*Responsibility Rules and Standards* (2017), § 9.22).

Several aggravating factors are implicated in this case. This Court issued

Respondent a reprimand on December 15, 2017. *Id.* at 502, 175 A.3d at 140. Additionally,

Petitioner requests that we take judicial notice of a reprimand that the Attorney Grievance

Commission issued against Respondent in a letter dated June 29, 2018. The bases for the

reprimand include Respondent's failure to file fiduciary tax returns for a fifteen-year period

on behalf of an estate for which he had been appointed special administrator and his deposit

of the estate's funds in his law firm's attorney trust account. Additionally, Respondent

failed to properly create and maintain client matter records in accordance with the

Maryland Rules governing attorney trust accounts.[17]

With respect to aggravating factor (c), a pattern of misconduct, we have concluded

that Respondent's conduct reflected a pattern of obstructive attempts to prevent the

disbursement of estate funds so that he could secure reimbursement for his legal fees. We

have also concluded that Respondent's conduct was primarily spurred by a pecuniary,

selfish motive, another aggravating factor. Respondent has refused to acknowledge the

---

[17] Specifically, the Attorney Grievance Commission reprimanded Mr. Woolery for violations of Rule 1.1 (Competence), Rule 1.3 (Diligence), and Rule 1.15(a) of the MLRPC, in effect prior to July 1, 2016 and Rule 19-301.15(a), which took effect July 1, 2016.

wrongful nature of his actions and testified at the disciplinary hearing that had he not missed the six-month time bar for filing a claim against Mr. Watson's Estate, he would have pursued his claim against his former client. Finally, Mr. Woolery had been a member of the Maryland Bar for more than 25 years at the time of his misconduct.

The hearing judge found no mitigating factors.

We have had numerous occasions to pass upon an appropriate sanction for an attorney who violated the Rules of Professional Conduct related to the mishandling of an estate. *See e.g., Attorney Grievance Comm'n v. Kendrick*, 403 Md. 489, 489, 943 A.2d 1173, 1173 (2008) (indefinite suspension); *Attorney Grievance Comm'n v. Sullivan*, 369 Md. 650, 650, 801 A.2d 1077, 1077 (2002) (disbarment); *Attorney Grievance Comm'n v. Owrutsky*, 322 Md. 334, 334, 587 A.2d 511, 511 (1991) (three-year suspension). The common characteristic in these cases, however, is that the attorney was serving in the capacity of a personal representative when the misconduct occurred. In the case at bar, Mr. Jefferies's Estate suffered several appointments, but a personal representative was not one of them, other than for a few brief moments when Mr. Sasser was appointed *pro forma*. For these reasons, we are not solely guided by the attorney discipline cases in which the attorney engaged in misconduct while serving as a personal representative.

In a case where the attorney sued his former client, without consent, we were troubled by the violation of Rule 1.9 as it reflected poorly on the attorney's integrity. *See Attorney Grievance Comm'n v. Powers*. 454 Md. 79, 112, 164 A.3d 138, 157 (2017) ("Respondent's violations, particularly of Rules 1.6 and 1.9, seriously undermine his integrity as a member of this Bar."). In that case, we indefinitely suspended the attorney.

- 44 -

*Id.* We are similarly troubled here by Mr. Woolery's suit against Mr. Sasser in the District Court. Mr. Woolery did not secure Mr. Sasser's consent prior to filing the suit. Moreover, Mr. Woolery's allegations in the suit spurred another violation of the MARPC, specifically Rule 3.3(a), because he falsely asserted that Mr. Hutchens was seeking to recover damages that were, in fact, only for the benefit of either Respondent or his law firm.

Mr. Woolery's statement in the District Court filing, along with his false allegation involving Ms. Miller's alleged representation of Mr. Watson, as stated in the petitions to remove Ms. Miller as special administrator, represent repeated acts of misrepresentation to a tribunal. We disbarred an attorney who repeatedly demonstrated a lack of candor and truthfulness and observed that "[c]andor and truthfulness are two of the most important moral character traits of a lawyer." *Attorney Grievance Comm'n v. Myers*, 333 Md. 440, 449, 635 A.2d 1315, 1319 (1994) (attorney had previously been suspended for three years for fabricating a document in order to mislead the Attorney Grievance Commission then later, after reinstatement, lied under oath to a District Court judge about his driving record). Of course, Mr. Woolery's violation of Rule 3.3(a) also resulted in a violation of Rule 8.4(c).

Bar Counsel's suggestion that we disbar Mr. Woolery stems from the commonalties of Respondent's misconduct and that of the attorney in *Attorney Grievance Comm'n v. Framm*. 449 Md. 620, 144 A.3d 827 (2016). At the outset, we note that both the attorney in *Framm* and Mr. Woolery violated the Rule intended to ward against conflict of interests between clients. *Id.* at 629, 144 A.3d at 833. In *Framm*, the attorney noted exceptions to the conclusion that she violated Rule 1.7 on the basis that her clients' "interests in that matter were at all times aligned." 449 Md. at 655, 144 A.3d at 848. Mr. Woolery echoed

- 45 -

this same reasoning in his exceptions. In the *Framm* case, this Court also concluded that the attorney failed to adequately communicate with her client, failed to represent her client competently and diligently, and charged and collected unreasonable fees. *Id*. at 645-54, 144 A.3d at 842-47. One major distinction between the misconduct underlying the disbarment in *Framm* and the case at bar is that in *Framm* the attorney disingenuously used her client's diminished capacity when it worked to her advantage to do so. *Id.* at 658, 144 A.3d at 850. Concluding that this conduct violated Rule 3.3(a)(1), we explained that

> Respondent's misrepresentations were made intentionally, given that Respondent had personal knowledge of the extent of Mr. Wilson's diminished capacity and took a position in the fee case that was directly contrary to the position she advanced before the court in the divorce and guardianship cases. Respondent cherry-picked the information that benefited her and bolstered her position that she was entitled to her fees, to the exclusion of all previous arguments she had made to the contrary. She did so knowing that her adversary was a former client with diminished capacity who was representing himself in that litigation.

*Id*. at 658-59, 144 A.3d at 850.

Generally, we have endeavored to distinguish the culpability of those attorneys whose actions reflect "deliberation and calculation, fully cognizant of the situation" from those "who, though doing the same act, do[] so unintentionally, negligently or without full appreciation of the consequences." *Attorney Grievance Comm'n v. Calhoun*, 391 Md. 532, 572, 894 A.2d 518, 542 (2006) (quoting *Attorney Grievance Comm'n v. Hayes*, 367 Md. 504, 517, 789 A.2d 119, 127 (2002)). This distinction is particularly important given that disbarment is the usual sanction for intentional misappropriation of funds. *See Attorney Grievance Comm'n v. Sperling*, 380 Md. 180, 192, 844 A.2d 397, 404 (2004). Critically, "[w]here there is no finding of intentional misappropriation [] and where the misconduct

- 46 -

did not result in financial loss to any of the respondent's clients, an indefinite suspension ordinarily is the appropriate sanction." *Id.* We explained that "a finding with respect to the intent with which a violation was committed is relevant to the appropriate sanction and consistent with the purpose of a disciplinary proceeding." *Id.*

Here, Judge Snoddy found that "Respondent intentionally withheld from [Ms.] Miller: the $900.00 in rent money he received from [Mr.] Hutchens in June 2013; the $400.00 in rent money he received from [Mr.] Watson on May 5, 2014; and the rent and expense receipts he obtained from [Mr.] Watson." This finding of intentionality was based on Mr. Woolery's continued avoidance of Ms. Miller's desperate and repeated requests for an accounting of the rent money collected. Mr. Woolery responded to Ms. Miller's requests by explaining that he used Estate funds for litigation purposes, but he did not supply her with an accounting. Upon Ms. Miller's next request, Mr. Woolery responded that "these matters have been fully documented in the discovery provided to folks previously, and of course a formal 'Accounting' will be done for the Orphans' Court by the Personal Representative." We also inquire whether Mr. Woolery's actions caused financial loss to any of his clients. *See id.* In this case, Mr. Woolery's relentless pursuit of getting reimbursed for the funds he claims he advanced on behalf of the Estate as well as legal fees, which he concedes was "unnecessarily aggressive," prevented Mr. Watson from receiving his rightful distribution prior to his death. Finally, the uncontroverted fact remains that Mr. Woolery has failed to remit to the Estate several rent payments he received from either Mr. Hutchens or Mr. Watson.

We also consider that Respondent has previously been disciplined by this Court. *Attorney Grievance Comm'n v. Woolery*, 456 Md. 483, 175 A.3d 129 (2017). In that disciplinary matter, the hearing judge at the Circuit Court observed that Respondent "displayed a contemptuous attitude" toward one of the parties, which resulted in Mr. Woolery's failure to carry out "what he was obligated to do for the estate." *Id*. at 499, 174 A.3d at 139. Here, the hearing judge observed a similar characteristic underlying Respondent's actions in the present matter. Respondent's false assertions in his pleadings before the Orphans' Court, according to Judge Snoddy, "were motivated by his personal animus against [Ms.] Miller following the October 31, 2014, settlement hearing and by [Mr.] Watson's recent termination of his representation." Moreover, Respondent's conduct in the case at bar overlapped in time with his conduct in the case that was previously before us in the 2017 Term. Finally, in the time between his reprimand by this Court and the issuance of the present Opinion, Mr. Woolery received a letter of reprimand from the Attorney Grievance Commission.

Finally, we do not overlook Mr. Woolery's misrepresentations towards a tribunal, in violation of Rules 3.3(a) and 8.4(c), as well as the misrepresentations he made in his attempt to secure legal fees from his former clients. *See Attorney Grievance Comm'n v. Steinberg*, 395 Md. 337, 337, 342-46 910 A.2d 429, 429, 432-34 (2006) (disbarring an attorney who made numerous misrepresentations to the court, his clients as well as opposing counsel)*; see also Attorney Grievance Comm'n v. Mixter*, 441 Md. 416, 416, 523-24, 109 A.3d 1, 1, 66 (2015) (disbarring an attorney whose practice of law consisted of a pattern of misrepresentations to the courts, parties and witnesses).

Where the facts, as in the case at bar, are uncontroverted that an attorney intentionally withheld and disbursed to himself funds, which belong to an Estate, and did so without authorization, the attorney has misappropriated funds. That the attorney did so without prior court approval and without an attorney-client relationship between himself and the Estate further aggravates the misappropriation. We agree with Bar Counsel that among the most egregious of the violations are Mr. Woolery's failure to notify the court-appointed fiduciaries that he was in possession of Estate funds and then his misappropriation of those funds. As we understand Judge Snoddy's factual findings, Mr. Woolery has yet to reimburse Mr. Jefferies's Estate for the funds he retained. For that reason, and the others explained herein, we hold that disbarment is the appropriate sanction in the present case.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS PURSUANT TO MARYLAND RULE 19-709(b), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST BENJAMIN JEREMY WOOLERY.**